[No. S044234. Jan. 29, 1996.]

ANDREW LAZAR, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
RYKOFF-SEXTON, INC., Real Party in Interest.

## COUNSEL

Ross & Morrison, Gary B. Ross, Andrew D. Morrison, Schulman & Miller, Barry A. Schulman and Jerry Miller for Petitioner.

William G. Hoerger, Luis Jaramillo, Joseph Posner, Quackenbush & Quackenbush and William C. Quackenbush as Amici Curiae on behalf of Petitioner.

No appearance for Respondent.

Gibson, Dunn & Crutcher, Martin C. Washton and Jeffrey F. Webb for Real Party in Interest.

Musick, Peeler & Garrett, Richard J. Simmons, Michael G. Morgan, Morrison & Foerster, Kirby Wilcox and James E. Boddy, Jr., as Amici Curiae on behalf of Real Party in Interest.

## OPINION

**WERDEGAR, J.**—We granted review in this matter to clarify, following our decisions in *Foley* v. *Interactive Data Corp.* (1988) 47 Cal.3d 654 [254

Cal.Rptr. 211, 765 P.2d 373] (*Foley*) and *Hunter* v. *Up-Right, Inc.* (1993) 6 Cal.4th 1174 [26 Cal.Rptr.2d 8, 864 P.2d 88] (*Hunter*), whether or under what circumstances a plaintiff may state a cause of action for fraudulent inducement of employment contract. The Court of Appeal concluded the allegations of the plaintiff in this case are adequate to state such a cause of action. For the reasons that follow, we agree. Accordingly, we affirm the judgment of the Court of Appeal.

## I. *Background*

■ Because this matter comes to us after the trial court sustained the defendant's demurrer, "we must, under established principles, assume the truth of all properly pleaded material allegations of the complaint in evaluating the validity" of the decision below. (*Tameny* v. *Atlantic Richfield Co.* (1980) 27 Cal.3d 167, 170 [164 Cal.Rptr. 839, 610 P.2d 1330, 9 A.L.R.4th 314]; see also *Alcorn* v. *Anbro Engineering, Inc.* (1970) 2 Cal.3d 493, 496 [86 Cal.Rptr. 88, 468 P.2d 216].)

Andrew Lazar alleged as follows:

Lazar was born in New York in 1950. He lived and worked in Long Island, New York until 1990. From 1972 to 1990, he was employed with a family-owned restaurant equipment company. As of 1990, he was president of the company, earning $120,000 annually and living in New York with his wife of 21 years and his 2 children, ages 17 and 15.

In September 1989, a vice-president of real party in interest Rykoff-Sexton, Inc. (Rykoff or defendant) contacted Lazar and tried to persuade him to come to work in Los Angeles as Rykoff's West Coast general manager for contract design. Rykoff, through its vice-president and, later, through its president and its chief executive officer, intensively recruited Lazar through February 1990. For recruitment purposes, Rykoff brought Lazar and his wife to Los Angeles to visit Rykoff's offices, to visit realtors and to see the city.

During this recruitment process, Lazar told Rykoff he was concerned about relocating to Los Angeles, as the move would entail relinquishing a secure job as president of the family company where he had worked all his adult life, separating his children from their friends at an important time of their lives and leaving his home of 40 years. As a condition of agreeing to relocate, Lazar required Rykoff's assurance that his job would be secure and would involve significant pay increases.

In response to Lazar's concerns, Rykoff made representations to Lazar that led him to believe he would continue to be employed by Rykoff so long

as he performed his job and achieved goals. Rykoff represented that Lazar would enjoy continued advancement within the organization, would be welcomed as part of the Rykoff "family" and, as a Rykoff employee, would enjoy security and a strong future. Rykoff represented that Lazar would have a long-term relationship with the company. Additionally, Rykoff implied the current head of the department in which Lazar would work had plans to retire and Lazar would be groomed to assume that position.

Rykoff further represented that the company was very strong financially and anticipated solid growth and a stable, profitable future. In particular, Rykoff represented that the department in which Lazar would work was a growth division within the company and that Rykoff had plans to expand it. Rykoff also stated Rykoff would pay Lazar $130,000 annually to start and, if Lazar performed his job, his yearly income would quickly rise to $150,000. Rykoff told Lazar he would receive annual reviews and raises accordingly.

Lazar asked for a written employment contract, but was refused. Rykoff stated a written contract was unnecessary because "our word is our bond." In or about February 1990, Lazar accepted Rykoff's offer of employment on terms including the foregoing.

Rykoff's representations to Lazar regarding the terms on which he would be retained, Rykoff's financial health and Lazar's potential compensation were false and, when making them, Rykoff's agents knew they were false. Rykoff had in the immediately preceding period experienced its worst economic performance in recent history, and the company's financial outlook was pessimistic. In fact, Rykoff was planning an operational merger that would eliminate Lazar's position. Rykoff had no intention of retaining Lazar so long as he performed adequately. Instead, Rykoff secretly intended to treat Lazar as if he were an "at will" employee, subject to termination without cause. Rykoff knew the promised compensation increases would not be given, as company policy limited annual increases to 2 to 3 percent.

Based on Rykoff's representations, Lazar resigned his New York position and, in May 1990, commenced employment at Rykoff. The following month, Lazar bought a home in California and moved his family there.

Lazar performed his job at Rykoff in an exemplary manner. He obtained sales increases in his assigned region, and soon after he commenced employment his West Coast region achieved its sales budget for the first time. Lazar accomplished continued improvement in sales and lowered overall operating costs within his department.

In April 1992, Rykoff failed to pay Lazar certain bonus compensation to which he had become entitled under a company incentive program. Subsequently, in July, Lazar was terminated. Rykoff told Lazar his job was being

eliminated owing to management reorganization. A Rykoff vice-president told Lazar his termination was not performance related and was for cause.

The Rykoff vice-president further stated Lazar could leave the company with dignity by tendering a letter of resignation and by keeping his regular status (and all the appearances of job stability) for three months so that he could better search for a new job. In fact, Lazar was given a desk in Rykoff's warehouse, where noise from forklifts made use of the telephone an absurdity. The fact Lazar was leaving Rykoff was not maintained as a secret and became common knowledge. Lazar has been unable to find comparable employment.

As a consequence of Rykoff's conduct and Lazar's reliance on Rykoff's representations, Lazar lost past and future income and employment benefits. He lost contact with the New York employment market so that reemployment there is difficult or impossible. Lazar is burdened with payments on Southern California real estate he can no longer afford. Lazar and his family have experienced emotional distress, with both psychological and physical manifestations.

Lazar further alleged Rykoff acted with oppression, fraud, or malice within the meaning of Civil Code section 3294.

Based on these allegations, Lazar set forth causes of action for: (1) violation of Labor Code section 970 (false representations to induce relocation), (2) wrongful termination in violation of public policy, (3) fraud and deceit, (4) negligent misrepresentation, (5) breach of contract, (6) promissory estoppel, (7) intentional infliction of emotional distress, and (8) negligent infliction of emotional distress.

Rykoff demurred to all causes of action except the Labor Code and breach of contract claims. The trial court sustained Rykoff's demurrer in its entirety without leave to amend, leaving Lazar with only the Labor Code section 970 and breach of contract causes of action. Lazar unsuccessfully sought reconsideration, then a writ of mandate. (Lazar did not seek review of the trial court's sustaining of Rykoff's demurrer to his cause of action for promissory estoppel.)

The Court of Appeal issued a writ of mandate directing the superior court to vacate its order, insofar as it sustained Rykoff's demurrers to Lazar's causes of action for wrongful termination in violation of public policy, fraud and deceit, negligent misrepresentation, and intentional infliction of emotional distress, and to enter a new order overruling the demurrers to those causes of action.

We granted Rykoff's petition for review. Subsequently, we specified that the issues to be argued would be limited to whether, or under what circumstances, a plaintiff may state a cause of action for fraudulent inducement of employment contract. (Cal. Rules of Court, rule 29.2(b).)

## II. *Discussion*

### A. *Promissory fraud*

 "The elements of fraud, which give rise to the tort action for deceit, are (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage." (5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 676, p. 778; see also Civ. Code, § 1709; *Hunter, supra*, 6 Cal.4th 1174, 1184; *Molko* v. *Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1108 [252 Cal.Rptr. 122, 762 P.2d 46].)

 "Promissory fraud" is a subspecies of the action for fraud and deceit. A promise to do something necessarily implies the intention to perform; hence, where a promise is made without such intention, there is an implied misrepresentation of fact that may be actionable fraud. (*Union Flower Market, Ltd.* v. *Southern California Flower Market, Inc.* (1938) 10 Cal.2d 671, 676 [76 P.2d 503]; see Civ. Code, § 1710, subd. (4); 5 Witkin, Summary of Cal. Law, *supra*, § 685, pp. 786-787.)

An action for promissory fraud may lie where a defendant fraudulently induces the plaintiff to enter into a contract. (*Chelini* v. *Nieri* (1948) 32 Cal.2d 480, 487 [196 P.2d 915] ["tort of deceit" adequately pled where plaintiff alleges "defendant intended to and did induce plaintiff to employ him by making promises . . . he did not intend to (since he knew he could not) perform" (fn. omitted)]; *Kuchta* v. *Allied Builders Corp.* (1971) 21 Cal.App.3d 541, 549 [98 Cal.Rptr. 588], citing *Horn* v. *Guaranty Chevrolet Motors* (1969) 270 Cal.App.2d 477, 484 [75 Cal.Rptr. 871]; *Squires Dept. Store, Inc.* v. *Dudum* (1953) 115 Cal.App.2d 320, 323 [252 P.2d 418].) In such cases, the plaintiff's claim does not depend upon whether the defendant's promise is ultimately enforceable as a contract. "If it is enforceable, the [plaintiff] . . . has a cause of action in tort as an alternative at least, and perhaps in some instances in addition to his cause of action on the contract." (Rest.2d Torts, § 530, subd. (1), com. c., p. 65, cited with approval in *Tenzer* v. *Superscope, Inc.* (1985) 39 Cal.3d 18, 29 [216 Cal.Rptr. 130, 702 P.2d 212].) Recovery, however, may be limited by the rule against double recovery of tort and contract compensatory damages. (*Tavaglione* v. *Billings* (1993) 4 Cal.4th 1150, 1159 [17 Cal.Rptr.2d 608, 847 P.2d 574].)

Lazar's allegations, if true, would establish all the elements of promissory fraud. As detailed above, Lazar alleges that, in order to induce him to come to work in California, Rykoff intentionally represented to him he would be employed by the company so long as he performed his job, he would receive significant increases in salary, and the company was strong financially. Lazar further alleges that Rykoff's representations were false, and he justifiably relied on them in leaving secure New York employment, severing his connections with the New York employment market, uprooting his family, purchasing a California home and moving here.

Lazar alleges that Rykoff knew its representations regarding the terms upon which he would be retained in Rykoff's employ, potential salary increases and the financial strength of the company were false at the time they were made. He also alleges that, at the time Rykoff represented to him his job would be permanent and secure, Rykoff was planning an operational merger likely to eliminate Lazar's job, and Rykoff had no intention of retaining him so long as he performed adequately. Instead, Lazar alleges, Rykoff secretly intended to treat him as if he were subject to termination without cause. Lazar further alleges Rykoff knew the purported potential salary increases would not materialize, because company policy was to limit annual increases to 2 or 3 percent. These allegations adequately state a cause of action for promissory fraud as traditionally understood.

Rykoff and employers' groups appearing as amici curiae in support of Rykoff contend Lazar's fraud action is barred by our decisions in *Foley, supra*, 47 Cal.3d 654, and *Hunter, supra*, 6 Cal.4th 1174. Rykoff argues that, following *Foley* and *Hunter*, a California employee cannot state a tort claim arising from employment termination, other than wrongful termination in violation of public policy.

After cursory discussion, the Court of Appeal concluded, "*Hunter* did not preclude all fraud claims in the employment context. It merely bars the limited category of fraud claims arising from employer misrepresentations which are made to effect termination." We agree with the Court of Appeal's disposition permitting Lazar's fraud claim, but believe an adequate explanation of that result requires a somewhat fuller explication and clarification of our rationale in *Hunter*. In addition, we believe Rykoff is mistaken about the degree to which the policy considerations underlying our decision in *Foley* apply in fraudulent inducement of contract cases.

B. *Hunter*

In *Hunter, supra*, 6 Cal.4th 1174, we considered whether a terminated employee may recover tort damages for fraud and deceit predicated on a

misrepresentation used to effect the termination. Hunter, a welder, was falsely told by his supervisor a corporate decision to eliminate his position had been made. (*Hunter, supra,* 6 Cal.4th at pp. 1179, 1186.) After being refused an opportunity to work in a lesser position within the company, Hunter signed a document setting forth his resignation. (*Id.* at p. 1179.) The jury found that Up-Right, Hunter's employer, had breached an implied contract not to dismiss him without good cause. We noted that Up-Right could have accomplished Hunter's termination directly (incurring the risk of contract liability only) and had merely introduced the element of misrepresentation in the course of effecting that result. (*Id.* at pp. 1178, 1184.) Hunter, therefore, could not be said to have "relied to his detriment on the misrepresentations in suffering constructive dismissal." (*Id.* at p. 1184.)

Analyzing these circumstances in light of *Foley, supra,* and of the traditional elements of fraud, we concluded wrongful termination of employment ordinarily does not give rise to a cause of action for fraud or deceit, even if a misrepresentation is utilized to effect the termination. (*Hunter, supra,* 6 Cal.4th at p. 1178.) We reasoned that "such representations are merely the means to the end desired by the employer, i.e., termination of employment." (*Id.* at p. 1185.) The effect of Up-Right's misrepresentation was simply to transform Hunter's resignation into a constructive termination. (*Id.* at p. 1184.)

Seizing upon language in *Hunter* indicating tort recovery is available only "when the plaintiff's fraud damages cannot be said to result from [the] termination itself" (*Hunter, supra,* 6 Cal.4th at p. 1178), Rykoff argues Lazar's damages resulted from his termination and that *Hunter,* therefore, bars any tort recovery. According to Rykoff, *Hunter* stands for the general proposition that terminated employees should be limited to contract damages and, after *Hunter,* a terminated employee can obtain tort damages only by alleging the termination violated a fundamental public policy of the state. We disagree.

First, on its face *Hunter* does not preclude Lazar's fraud claim. As Lazar correctly points out, we expressly left open in *Hunter* the possibility "that a misrepresentation *not* aimed at effecting termination of employment, but instead designed to induce the employee to alter detrimentally his or her position in some other respect, might form a basis for a valid fraud claim even in the context of a wrongful termination." (*Hunter, supra,* 6 Cal.4th at p. 1185, italics in original.) The misrepresentations Lazar alleges were *not* aimed at effecting his termination, but, rather, at inducing him to accept Rykoff's offer of employment.

In *Hunter,* moreover, we specifically preserved promissory fraud claims. Indeed, despite this court's division over the issue of tort recovery for

misrepresentation used to effect termination, all seven members of the court either expressly or impliedly agreed that the action for promissory fraud remains viable in the employment context. (*Hunter, supra,* 6 Cal.4th at p. 1186, fn. 1 (maj. opn. by Panelli, J., Lucas, C. J., Baxter, J., and George, J., conc.) ["This is not a case of promissory fraud, and nothing in this opinion affects the availability of tort damages in any case in which the elements of promissory fraud are pleaded and proved."]; *id.* at p. 1188 (dis. opn. of Mosk, J., Arabian, J., conc.) ["[I]n cases of promissory fraud . . . both the breach [of contract] and the fraud leading to the breach are separately actionable."]; *id.* at p. 1197 (dis. opn. of Kennard, J.) ["[W]hen . . . the employer's conduct is not within the scope of the contractual employment relationship" the "defrauded employee is entitled to recover tort damages."].) As previously discussed, Lazar has adequately pled a cause of action for promissory fraud.

Looking deeper, it is clear the rationale for our decision in *Hunter* does not apply to this case. In *Hunter,* while we identified a situation in which a terminated employee was unable to plead all of the elements of fraud, we did not thereby intend to call into question generally the viability of traditional fraud remedies whenever they are sought by a terminated employee. Our decision in *Hunter* was not meant to alter fundamentally the law of fraud or to suggest it necessarily applies differently in the employment context than in other contexts. Rather, we applied traditional fraud analysis in the context of a termination "desired by the employer," where misrepresentation was introduced only "in the course of" effecting the desired termination, and where the employer "could have accomplished [the termination] directly." (*Hunter, supra,* 6 Cal.4th at pp. 1179, 1184, 1185.) Under such circumstances, we concluded, the Court of Appeal had "erred in inferring" the employer had committed a fraud. (*Id.* at pp. 1184-1185.)

*Hunter* dealt with a situation atypical of the usual fraud situation, in that there the alleged perpetrator of the fraud (the defendant employer, Up-Right) was attempting to accomplish by deception something it actually had power to accomplish forthrightly—termination of the plaintiff's employment. (See *Hunter, supra,* 6 Cal.4th at pp. 1184-1185.) *Hunter*'s rationale does not readily extend beyond the termination context because, in the ordinary fraud case, the alleged perpetrator of the fraud lacks the power to accomplish his objective without resort to duplicity.

We reasoned in *Hunter* that "no independent fraud claim" arose from Up-Right's "misrepresentation aimed at termination of employment" (*Hunter, supra,* 6 Cal.4th at p. 1185), because Hunter could not allege all of the elements of fraud. (See *Hunter, supra,* 6 Cal.4th at p. 1184, citing 5 Witkin,

Summary of Cal. Law, *supra*, Torts, § 676, p. 778; Civ. Code, § 1709; and *Hobart* v. *Hobart Estate Co.* (1945) 26 Cal.2d 412, 422 [159 P.2d 958].) Specifically, as we explained, Hunter could not allege detrimental reliance. (*Hunter*, *supra*, 6 Cal.4th at p. 1184.)

We noted, initially, that Hunter could not be said to have relied *to his detriment* on his employer's misrepresentation, because his employer "simply employed a falsehood to do what it otherwise could have accomplished directly." (*Hunter*, *supra*, 6 Cal.4th at p. 1184.) That is, Hunter's employer had the power to terminate him, rightly or wrongly. We further noted that some misrepresentations used in the course of a dismissal are "merely the means to the end desired by the employer, i.e., termination of employment." (*Hunter*, *supra*, 6 Cal.4th at p. 1185.) Had Hunter not resigned, he would, presumably, have been discharged in any event, a fact we implicitly recognized in noting that "the result of Up-Right's misrepresentation is indistinguishable from an ordinary constructive wrongful termination" (*id.* at p. 1184); in describing termination as Up-Right's "aim" and "desire" (*id.* at p. 1185); and in recognizing that the element of misrepresentation was introduced by Up-Right only "in the course of" Hunter's dismissal. (*Id.* at p. 1178.) Hunter himself testified he was told he would be terminated if he did not resign. (*Id.* at p. 1179.)

In short, because Up-Right had both the power and intention of discharging him in any event, Hunter was no worse off for being induced by Up-Right's misrepresentation to resign. While Hunter may have relied on Up-Right's misrepresentation, and while in reliance thereon he allegedly changed his position (from employed to unemployed), his reliance did not cause him any detriment, as the tort requires. (See *Hull* v. *Sheehan* (1952) 108 Cal.App.2d 804, 805 [239 P.2d 704]; *Bramaric* v. *Churich* (1951) 101 Cal.App.2d 846, 850 [226 P.2d 657].) Accordingly, Hunter could not plead detrimental reliance. Lacking this element, we said, his fraud claim was "without substance." (*Hunter*, *supra*, 6 Cal.4th at p. 1184).

By contrast, as alleged, Lazar's reliance on Rykoff's misrepresentations was truly detrimental, such that he may plead all the elements of fraud. Lazar's employer, Rykoff, did *not* have the power to compel Lazar to leave his former employment. Rykoff's misrepresentations were made before the employment relationship was formed, when Rykoff had no coercive power over Lazar and Lazar was free to decline the offered position. Rykoff used misrepresentations to induce Lazar to change employment, a result Rykoff presumably could *not* have achieved truthfully (because Lazar had required assurances the Rykoff position would be secure and would involve significant increases in pay). Moreover, Lazar's decision to join Rykoff left

Lazar in worse circumstances than those in which he would have found himself had Rykoff not lied to him. (Allegedly, Lazar's secure living and working circumstances were disrupted, and Lazar became the employee of a financially troubled company, which intended to treat him as an at-will employee.)

In sum, *Hunter's* core rationale (that a substantial fraud claim could not be pled because the element of detrimental reliance was absent) does not apply to this case. As alleged, Lazar's reliance was truly detrimental.

Contrary to Rykoff's arguments, our rationale for deciding *Hunter* does not preclude tort recovery in every case involving a termination. While in previewing our rationale in *Hunter,* we indicated it would support tort recovery "only" with respect to a misrepresentation that is "separate from the termination of the employment contract" (see *Hunter, supra,* 6 Cal.4th at p. 1178), we did not mean thereby to suggest that simply effecting a termination in conjunction with fraudulent conduct will insulate an employer from an otherwise properly pled fraud claim. We meant, rather, to preclude fraud recovery only where "the result of [the employer]'s misrepresentation is indistinguishable from an ordinary constructive wrongful termination." (*Hunter, supra,* 6 Cal.4th at p. 1184.)

Here, Rykoff's alleged misrepresentation was not made in the course of Lazar's termination, but, rather, is separate from his termination. The damage Lazar alleges does not, moreover, "result from [the] termination *itself*" (*Hunter, supra,* 6 Cal.4th at p. 1178, italics added), but from Rykoff's misrepresentations (which allegedly came to light only at the time of termination). Absent its misrepresentations, Rykoff would not have been in the position to terminate Lazar, because Lazar allegedly would not have consented to the employment contract in the first place.

Thus, *Hunter* does not bar Lazar's fraud claim.

## C. *Foley*

Rykoff suggests our recognition, in *Foley, supra,* 47 Cal.3d 654, that the employment relationship is "fundamentally contractual" (*Foley, supra,* at p. 696), coupled with references in *Hunter* to economic policy considerations we invoked in *Foley* (see *Hunter, supra,* 6 Cal.4th at pp. 1180-1182), implies employees should generally be limited to contract damages for employment terminations. Rykoff argues that permitting tort remedies in the employment context is unnecessary and extraordinarily costly, and the policy reasons for which we declined to extend tort relief in *Foley* apply with equal force

against Lazar's claim for fraudulent inducement of employment contract. (See 47 Cal.3d at p. 693.)

*Foley* addressed whether tort remedies should be available for employment terminations that allegedly breach the implied covenant of good faith and fair dealing. At issue was whether the employment relationship was "sufficiently similar to that of insurer and insured to warrant judicial extension of the proposed additional tort remedies" for breach of the implied covenant of good faith and fair dealing in an employment contract. (*Foley*, *supra*, 47 Cal.3d at p. 693.) We declined to make that extension, "in view of the countervailing concerns about economic policy and stability, the traditional separation of tort and contract law, and finally, the numerous protections against improper terminations already afforded employees." (*Ibid.*)

Thus, the issue in *Foley* was whether to acknowledge the existence of a *previously unrecognized* cause of action (i.e., tortious breach of the implied covenant of good faith and fair dealing in the employment context). The issue in this case is whether we should restrict the availability of traditional tort remedies when they are sought in the employment context. In *Foley*, we recognized "the extension of . . . [available] tort remedies" proposed by plaintiffs had "the potential to alter profoundly the nature of employment, the cost of products and services, and the availability of jobs." (*Foley*, *supra*, 47 Cal.3d at p. 694.) We concluded any such extension is "better suited for legislative decisionmaking." (*Ibid.*) Here, by contrast, defendant's suggestion this court, in order to optimize California's business climate for employers generally, should *restrict* the application of tort remedies traditionally available in the employment context, would seem to urge upon us a quasi-legislative enterprise such as we refused in *Foley*.

In declining judicially to *expand* tort remedies for breaches of the implied covenant in *Foley*, we alluded to the need for courts to practice restraint when asked to fashion new remedies in areas of the law already governed by "numerous legislative provisions" and subject to a "diversity of possible solutions." (*Foley*, *supra*, 47 Cal.3d at p. 700.) Similarly, in this case, we should be mindful that our Legislature more than a century ago codified the common law cause of action for promissory fraud in inducing a contract, along with actions for promissory fraud and fraud, generally. (See Civ. Code, §§ 1572, subd. 4, 1709, 1710.) These statutes provide no express exception for employers or employees. Accordingly, judicial restraint such as we exercised in *Foley* counsels *against* disallowing the traditional fraud claim pled in this case.

Our concern in *Foley* not to create "potential tort recovery in every [discharge] case" (47 Cal.3d at p. 696) does not weigh as heavily here,

where plaintiff alleges a traditional fraud cause of action. ■■■ In California, fraud must be pled specifically; general and conclusory allegations do not suffice. (*Stansfield* v. *Starkey* (1990) 220 Cal.App.3d 59, 74 [269 Cal.Rptr. 337]; *Nagy* v. *Nagy* (1989) 210 Cal.App.3d 1262, 1268 [258 Cal.Rptr. 787]; 5 Witkin, Cal. Procedure (3d ed. 1985) Pleading, § 662, pp. 111-112.) "Thus ' "the policy of liberal construction of the pleadings . . . will not ordinarily be invoked to sustain a pleading defective in any material respect." ' [Citation.] [¶] This particularity requirement necessitates pleading *facts* which 'show how, when, where, to whom, and by what means the representations were tendered.' " (*Stansfield, supra*, 220 Cal.App.3d at p. 73, italics in original.) A plaintiff's burden in asserting a fraud claim against a corporate employer is even greater. In such a case, the plaintiff must "allege the names of the persons who made the allegedly fraudulent representations, their authority to speak, to whom they spoke, what they said or wrote, and when it was said or written." (*Tarmann* v. *State Farm Mut. Auto. Ins. Co.* (1991) 2 Cal.App.4th 153, 157 [2 Cal.Rptr.2d 861].)

Our decision in *Foley* does not provide authority for exempting employers from ordinary fraud rules that apply to Californians generally. In fact, *Foley*'s entire thrust is to the contrary insofar as we held employers to ordinary, rather than special, standards. (*Foley, supra*, 47 Cal.3d at p. 693 [holding employers are not governed by the "special relationship" standard applicable to insurers].) Moreover, while *any* lawsuit that names an employer as defendant theoretically implicates the same general range of economic policy considerations we discussed in *Foley*, those policy considerations do not necessarily apply with the same force in a fraud case.

■■■ Contrary to defendant's arguments, fraudulent inducement of contract—as the very phrase suggests—is not a context where the "traditional separation of tort and contract law" (*Foley, supra*, 47 Cal.3d at p. 693; *Hunter, supra*, 6 Cal.4th at p. 1181) obtains. To the contrary, this area of the law traditionally has involved both contract and tort principles and procedures. For example, it has long been the rule that where a contract is secured by fraudulent representations, the injured party may elect to affirm the contract and sue for the fraud. (*Campbell* v. *Birch* (1942) 19 Cal.2d 778, 791 [122 P.2d 902]; see generally, 5 Witkin, Summary of Cal. Law, *supra*, Torts, § 726, pp. 825-826.)

■■■ Defendant opines that barring claims for fraudulent inducement of employment contract, in light of "existing protections against improper terminations" (see *Hunter, supra*, 6 Cal.4th at p. 1182, citing *Foley, supra*, 47 Cal.3d at pp. 692-693), would leave employees well protected. But the resolution proposed here involves affirming, not inventing, the cause of

action for promissory fraud. Thus the "existing protections" we invoked in *Hunter* necessarily included the availability of promissory fraud actions like this one.

More fundamentally, it is a truism that contract remedies alone do not address the full range of policy objectives underlying the action for fraudulent inducement of contract. In pursuing a valid fraud action, a plaintiff advances the public interest in punishing intentional misrepresentations and in deterring such misrepresentations in the future. (Cf. *Foley*, *supra*, 47 Cal.3d at p. 683 [recognizing tort law is designed to vindicate social policy].) Because of the extra measure of blameworthiness inhering in fraud, and because in fraud cases we are not concerned about the need for "predictability about the cost of contractual relationships" (*ibid.*), fraud plaintiffs may recover "out-of-pocket" damages in addition to benefit-of-the-bargain damages. (*Tavaglione* v. *Billings*, *supra*, 4 Cal.4th at p. 1159, citing with approval *Pat Rose Associates* v. *Coombe* (1990) 225 Cal.App.3d 9, 20 [275 Cal.Rptr. 1]; see also *Freeman & Mills, Inc.* v. *Belcher Oil Co.* (1995) 11 Cal.4th 85, 97 [44 Cal.Rptr.2d 420, 900 P.2d 669] [discussing "[t]he distinction between tort and contract actions, and their purposefully different measure of damages"].) For example, a fraudulently hired employee, as Lazar has alleged himself to be, may incur a variety of damages "separate from the termination" itself, such as the expense and disruption of moving or loss of security and income associated with former employment.

It is true that in *Hunter* we buttressed our fraud analysis with references to some of the economic policy considerations reviewed in *Foley*. (See *Hunter*, *supra*, 6 Cal.4th at pp. 1180-1182 [reviewing the grounds for *Foley*'s conclusion the employment relationship is fundamentally contractual]; *id.* at p. 1183 [reviewing restrictions on tort recovery for injuries covered by workers compensation].) Our *Hunter* opinion does contain some broad language suggestive of Rykoff's position. (See, e.g., *Hunter*, *supra*, 6 Cal.4th at p. 1185 ["Recognition of a fraud cause of action in the context of wrongful termination of employment not only would contravene the logic of *Foley*, but also potentially would cause adverse consequences for industry in general."])

Nevertheless, we reject Rykoff's contention that, by citing *Foley* in *Hunter*, we restricted or abandoned traditional tort remedies in the employment context. Instead, our reference in *Hunter* to "the logic of *Foley*" (*Hunter*, *supra*, 6 Cal.4th at p. 1185) merely invoked *Foley*'s holding that tort damages should not be judicially extended in order to "fashion remedies for breach of a contract provision." (*Foley*, *supra*, 47 Cal.3d at p. 700.) In *Hunter*, we had concluded that a misrepresentation to effect termination of

employment did not "rise to the level of a separately actionable fraud." (*Hunter, supra,* 6 Cal.4th at p. 1185.) Since "the result of Up-Right's misrepresentation [was] indistinguishable from an ordinary wrongful termination" (*id.* at p. 1184), *Foley*'s "logic" (that, in light of "potentially enormous [economic] consequences," tort remedies ought not be judicially extended beyond their traditional limits) became pertinent. (47 Cal.3d at p. 699.)

■ This case is different. Here we are not dealing with allegations of breach of a contract provision, but with allegations of fraud. *Foley* was a *contract* case in which we declined to *expand* the availability of tort remedies for breach of contract; this is a *tort* case in which we are being asked by defendant to *constrict* traditional tort remedies.

Defendants fix upon our reference in *Hunter* to "*Foley*'s conception of the employment relation as fundamentally contractual, giving rise only to contractual damages in the event of [a] breach in the absence of some violation of a fundamental public policy." (*Hunter, supra,* 6 Cal.4th at p. 1182.) While in *Hunter* we noted we have "continuously adhered to that view" (*id.* at p. 1178), we were referring there to our consistent refusal to validate tort remedies for breach of contract, *not* to any erosion of traditional fraud remedies.

Nevertheless, defendant argues that in *Hunter* we impliedly extended *Foley* to preclude recovery of tort damages in any case where the plaintiff fails to allege the discharge violated a fundamental public policy. Defendant points to *Hine* v. *Dittrich* (1991) 228 Cal.App.3d 59 [278 Cal.Rptr. 330], *Soules* v. *Cadam, Inc.* (1991) 2 Cal.App.4th 390 [3 Cal.Rptr.2d 6] and *American Guar. & Liability* v. *Vista Medical Supply* (N.D.Cal. 1988) 699 F.Supp. 787 as instances where courts have recognized and applied such a principle to defeat the plaintiff's tort claims. In *Hunter,* we cited *Hine* and *Soules* as examples of Court of Appeal cases following *Foley,* and suggested the conclusion in *American Guar. & Liability,* (that an employee's negligent misrepresentation claim, which arose out the employer's intentional act of discharging her, was "part and parcel" of her wrongful discharge claim), was "correct and pertinent" to the issue before us. (*Hunter, supra,* 6 Cal.4th at p. 1182.)

Defendant argues that, in referring to *Hine* and *Soules* in *Hunter,* we impliedly endorsed the proposition that an employee can never state a tort claim arising from employment termination, other than wrongful termination in violation of public policy. Defendant makes too much of our mention of these cases. Our references in *Hunter* simply buttressed, in general terms,

our recognition that California courts "have adhered to *Foley*'s conception of the employment relation." (*Hunter, supra,* 6 Cal.4th at p. 1182, citing *Hine, Soules* and *American Guar. & Liability.*) Nothing in *Hunter*'s language or reasoning committed us to wholesale adoption of the sometimes sweeping analyses or conclusions contained in *Hine, Soules* and *American Guar. & Liability.*

*Hine* v. *Dittrich, supra,* 228 Cal.App.3d 59, was a negligent supervision case in which the plaintiff specifically alleged he suffered no injury until he was discharged. (*Hine* v. *Dittrich, supra,* 228 Cal.App.3d at p. 64.) In a portion of the opinion we did not quote in *Hunter,* the Court of Appeal expansively opined: "As long as the alleged injury would not have occurred but for the employment termination, *Foley* indicates that the employee is generally limited to a contractual remedy." (228 Cal.App.3d at p. 65.) By contrast, Lazar alleges injuries from intentionally tortious behavior which occurred before, during and after the actual termination. In *Soules,* the Court of Appeal disapproved the use of pleading artifice to relabel a deficient breach of contract claim. (*Soules* v. *Cadam, Inc., supra,* 2 Cal.App.4th at pp. 403-404.) By contrast, even defendant does not contend this case is one of artful pleading; as discussed, Lazar has alleged the traditional elements of promissory fraud. More importantly, the plaintiff in *Soules* founded his tort claims entirely upon conduct alleged to have breached the employment contract. (*Id.* at p. 404.) Lazar alleges fraudulent inducement.

While in *Hunter* we also approved in dictum the court's conclusion in *American Guar. & Liability* v. *Vista Medical Supply, supra,* 699 F.Supp. 787, that the employee's negligent supervision claim was subsumed in her wrongful termination claim (*Hunter, supra,* 6 Cal.4th at p. 1182), we did not intend thereby to usurp the legislative function and create any new across-the-board tort immunity for employers who wrongfully terminate employees. We agree with plaintiff there is no "*Foley* doctrine" stating or implying that employers who terminate employees do or should enjoy broad special immunities from tort liability.

In short, nothing in the logic of *Foley,* or our subsequent discussion in *Hunter* of the policy considerations underlying *Foley,* suggests California fraud doctrine should be revised judicially in the manner defendant advocates. Thus, *Foley* does not bar Lazar's fraud claim.

### III. *Conclusion*

Consistent with the foregoing, as to his *fraud* claim Lazar may properly seek damages for the costs of uprooting his family, expenses incurred in

relocation, and the loss of security and income associated with his former employment in New York. On the facts as pled, however, Lazar must rely on his *contract* claim for recovery of any loss of income allegedly caused by wrongful termination of his employment with Rykoff. Moreover, any overlap between damages recoverable in tort and damages recoverable in contract would be limited by the rule against double recovery. (*Tavaglione* v. *Billings*, *supra*, 4 Cal.4th at p. 1159.)

Lazar, therefore, may proceed with his claim for fraud in the inducement of employment contract, properly seeking damages for "all the detriment proximately caused thereby" (Civ. Code, § 3333), as well as appropriate exemplary damages (Civ. Code, § 3294).

For the foregoing reasons, the judgment of the Court of Appeal is affirmed.

Lucas, C. J., Arabian, J., Baxter, J., and George, J., concurred.

MOSK, J.—I concur in the judgment. I also agree with much of the reasoning of the majority opinion. I continue to believe, however, that *Hunter* v. *Up-Right, Inc.* (1993) 6 Cal.4th 1174 [26 Cal.Rptr.2d 8, 864 P.2d 88] (*Hunter*) was wrongly decided. The majority today do not overrule *Hunter*—indeed, because the present case is factually distinguishable, they have no occasion to do so. Instead, they reject the more extreme view of that case urged by real party in interest Rykoff-Sexton, Inc. (Rykoff), and attempt to put *Hunter* on a firmer logical basis. Although I remain unpersuaded that *Hunter* is soundly reasoned, I welcome the majority's limitation of *Hunter*'s potentially broad holding.

The majority wisely repudiate Rykoff's view that *Hunter* and *Foley* v. *Interactive Data Corp.* (1988) 47 Cal.3d 654 [254 Cal.Rptr. 211, 765 P.2d 373] stand for the radical proposition that courts should not, for public policy reasons, enforce any tort liability arising in connection with the wrongful termination of an employment contract. They correctly identify the question in *Hunter* and the present case as whether all the traditional elements of fraud, and specifically the element of detrimental reliance, are present. They maintain that no detrimental reliance could be found in *Hunter*, stating: "Hunter's employer had the power to terminate him, rightly or wrongly. . . . Had Hunter not resigned, he would, presumably, have been discharged in any event . . . . [¶] In short, because Up-Right had both the power and intention of discharging him in any event, Hunter was no worse off for being induced by Up-Right's misrepresentation to resign." (Maj. opn., *ante*, at p. 642.) Thus, they reason that Hunter did not *detrimentally*

rely on Up-Right's misrepresentation inducing him to resign because he would have been discharged in any case.

Although I disagree with the majority's interpretation of the facts of the *Hunter* case (see *Hunter*, *supra*, 6 Cal.4th at p. 1191 (dis. opn. of Mosk, J.)), there is no need to reargue the merits of a case already decided. But the majority appear to recognize that the question central to *Hunter*—whether an employee who is deceived into resigning may sue the employer for fraud— turns on the answer to a question of fact: whether it is probable that the employee would have been terminated anyway, and therefore did not rely detrimentally on the employer's misrepresentation in any actual sense. The majority appear to presume that if an employer had both the intention and the power to discharge an employee, then the employee will be inevitably discharged by either truthful or deceptive means, and is therefore no worse off for having been deceived into resigning. But that presumption must be rebuttable on a contrary factual showing.

Under what circumstances would an employer who has the ability and intention to discharge an employee nonetheless refrain from discharging him *except* by means of misrepresentation? The answer, surely, is that under some circumstances, the employer will refrain from discharging the employee outright because it is too *costly* to do so. Employers may, for example, resort to such fraudulent deception when they know that to terminate the employee straightforwardly will lead to a lawsuit in which the employee would likely prevail. This species of fraud may be especially common in those situations in which a manager superior to the employee seeks to be rid of the employee, but finds such a decision to be at variance with official company policy. In such a case, the manager may seek not only to avoid potential lawsuits, but also the employer's internal disciplinary processes (see, e.g., *Scott* v. *Pacific Gas & Electric Co.* (1995) 11 Cal.4th 454, 460-461 [46 Cal.Rptr.2d 427, 904 P.2d 834]) by obtaining the employee's resignation through trickery. Under these circumstances, the employee would likely not have been fired unless the manager could resort to deception. Therefore the employee who resigns in reliance on such deception can be said to have "detrimentally relied," by any reasonable understanding of that term. The employee would therefore have a cognizable action for fraud against the manager and against his employer.

In the present case, the majority rightly recognize that all the elements of fraud, including detrimental reliance in the traditional sense, have been properly alleged in this ordinary fraudulent inducement case. By framing the *Hunter* opinion in narrow terms, the majority move in the direction of acknowledging that the question whether an employee has detrimentally

relied on an employer's misrepresentations in connection with a discharge is one of fact, to be determined from the totality of the circumstances.

**KENNARD, J.,** Concurring.—I agree with the analysis and conclusions of the majority, with the following exception. The majority describes at some length the "rationale" underlying this court's opinion in *Hunter* v. *Up-Right, Inc.* (1993) 6 Cal.4th 1174 [26 Cal.Rptr.2d 8, 864 P.2d 88]. (Maj. opn., *ante*, at pp. 641-642.) *Hunter* is now the law, but the rationale on which it is based is not well founded, as I explained in my dissenting opinion in that case. (*Hunter, supra*, 6 Cal.4th at pp. 1196-1198 (dis. opn. of Kennard, J.).) To the extent that the majority opinion may be read as endorsing *Hunter*'s reasoning, I do not join it. I agree with the majority, however, that *Hunter* is distinguishable from this case, and that the judgment of the Court of Appeal should be affirmed.