[No. F043471. Fifth Dist. May 27, 2005.]

KEVIN HELMER, Plaintiff and Appellant, v.
BINGHAM TOYOTA ISUZU et al., Defendants and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

_____

*Pursuant to California Rules of Court, rules 976(b) and 976.1, only the Introduction, Procedural and Factual Histories, part II A(1) and (2), and the Disposition are certified for publication.

COUNSEL

Sedgwick, Detert, Moran & Arnold, Christina J. Imre, Karen F. White; Law Offices of Poole & Pereira and Paul A. Pereira for Defendants and Appellants.

Sagaser, Franson & Jones, Sara Hedgpeth-Harris; Oren & Paboojian, Warren R. Paboojian and Jason S. Bell for Plaintiff and Appellant.

**O**PINION

**WISEMAN, J.**—Plaintiff Kevin Helmer filed suit against defendants Bingham Toyota Isuzu and Bob Clark, his former employer and supervisor, for promissory fraud. He alleges that he was fraudulently induced to leave a prior job due to false promises made to him by Clark. A jury found in Helmer's favor, awarding him $450,913 in compensatory damages and $1.5 million in punitive damages. Later, the court reduced the punitive damage award to $675,000.

Bingham appeals the judgment, arguing that 1) Helmer did not prove the elements of a cause of action for promissory fraud; 2) the award of compensatory damages was excessive; and 3) the punitive damages award was excessive and not supported by the evidence. Helmer also appeals, contending that the trial court erred in reducing the amount of punitive damages.

■ In the published portion of this opinion, we uphold the jury's award of economic damages for the lost income Helmer suffered as a result of his leaving a secure job due to Clark's false promises regarding the monthly compensation he would earn at Bingham. ■ In doing so, we hold that future lost income is recoverable by an employee pursuing a claim of promissory fraud against an employer who induces him to leave secure employment by knowingly making false promises regarding the terms of his future employment.

In the unpublished portion of this opinion, we find that substantial evidence supported the jury's finding that Clark made a false promise to Helmer, that the jury properly awarded Helmer compensatory damages for his emotional distress, and that a managing agent engaged in conduct that permitted the award of punitive damages, the amount of which was correctly reduced by the trial court pursuant to federal and state law.

## *PROCEDURAL AND FACTUAL HISTORIES*

On August 31, 2001, Helmer filed a first amended complaint in Fresno County Superior Court alleging the following causes of action: intentional misrepresentation, promissory fraud, and negligent misrepresentation. Bingham and Clark filed a motion for summary judgment, which was denied. A bifurcated jury trial began in April 2003.

*Liability phase*

In 1981, after being honorably discharged from the United States Marine Corps, Helmer began his career in automobile parts. In 1998, after working at

various automobile dealerships in the Central Valley, Helmer began working for Lithia Automotive in the parts department as a parts person. In March 1999, Helmer was promoted to parts manager and in May 1999 was promoted to parts and service manager. Helmer's compensation was approximately $5,800 to $5,900 per month. As an employee at Lithia, there was a maximum amount of compensation that Helmer could earn each month—$6,500.

Helmer learned that Bingham Toyota Isuzu had a job opening in its parts department. In September 1999, Helmer completed an application for the position and talked with Clark, who was the director of parts and service at Bingham. Clark had the authority to hire and fire employees at Bingham. During this meeting, Clark asked Helmer how much he earned in compensation at Lithia. Helmer responded that he averaged "between 57 plus a month, that it was 5700 [5,700] and it could go up as high as 6,000." There is no dispute in Helmer's mind that he told Clark he needed to earn at least $5,700 per month in compensation.

According to Helmer, in response to this conversation, Clark then opened his desk drawer, pulled out a financial statement, made some calculations, and stated that "if [Helmer] had been employed by Bingham since January, [he] would have made $70,000 up to that point." Clark did not show Helmer the documents upon which he based this statement nor how he made the calculations.

Based on Clark's representation, Helmer decided to leave Lithia and join Bingham. Bingham's offer of employment was attractive to Helmer—it was a Toyota franchise and he was familiar with Toyota parts, he knew 90 percent of the parts employees, and, because the prior parts manager had been an employee for nearly 25 years, it was a place where Helmer believed he could "finish out [his] career." Helmer gave Lithia two weeks' notice. Helmer's supervisor at Lithia, Ron Kirby, was "sad" to see Helmer leave and believed that Helmer was a "good" and "reliable" employee.

Helmer's first day of work at Bingham was October 11, 1999. On his first day, Clark presented Helmer with a pay plan to sign. According to Helmer, Clark did not explain the pay plan and it simply was included in the packet of papers that he needed to sign.[1]

---

[1] The pay plan works as follows: Helmer had a base salary of $1,500 per month and received a "draw" of at least $4,000 per month off his commissions; however, if his commissions (calculated by taking 7 percent of a certain figure on the monthly financial statement) totaled more than $4,000, he would receive that commission amount in addition to the $1,500 base salary. Helmer understood the pay plan differently—he believed he would receive a $1,500 base salary, plus a $4,000 draw, plus 7 percent of commissions, which would total at least $70,000 (as Clark promised) in a nine-month period.

When Helmer received his first paycheck in November, he was concerned because it was $4,400—which was less than the $5,700 per month that Helmer believed he and Clark had agreed he would earn. Helmer approached Clark, who told him that he did not understand why he had received that amount and that he would look into it. Clark, however, did not get back to Helmer regarding the amount.

In December, Helmer received his paycheck in the amount of $5,100, which again was less than $5,700. Helmer again questioned Clark about the amount, who suggested that if Helmer worked extra hours in the body shop, he could earn the additional money in his check.

In January 2000, Helmer received another paycheck in the amount of $4,800. In February, Helmer discussed with Clark again that his pay was less than $5,700 per month. According to Helmer, Clark asked for proof that Helmer had made $5,700 per month at Lithia and stated that Linda Gist, Bingham's controller, did not believe that Helmer earned that amount of money at Lithia. Helmer provided his pay stubs from Lithia. Helmer believed that, once he provided verification of his pay at Lithia, Clark would pay him according to what they had agreed prior to his accepting employment at Bingham.

In March, after no changes had been made to his compensation, Helmer spoke with Clark. After that, Helmer, Clark and Gist had a meeting, during which Helmer explained to Gist that Clark had promised Helmer he would earn over $70,000 and that he needed to receive the $5,700 per month in compensation that he had been promised. According to Helmer, Gist said that there was no way Bingham could guarantee to pay him $70,000 in a nine-month period. Helmer explained that he did not care about earning $70,000, but that he just wanted the $5,700 per month he and Clark had talked about. Approximately two days later, Clark notified Helmer that he was "letting" him go and that he was "terminated." Clark presented Helmer with his final check and Helmer was asked to return the "demo" car he was allowed to drive.

Unbeknown to Helmer, Gist had contacted Stan Ingersol, who had also applied for the position of parts manager back when it first became available in October 1999. Gist invited Ingersol to the dealership for an interview, during which Gist and Clark told Ingersol that Helmer was going to be fired. At the time of the interview, Helmer was still employed at Bingham.

After his termination, Helmer filed for and received unemployment benefits. Helmer contacted Kirby for a job, but they had already filled the

position of parts manager. In addition, Lithia had a strict no-rehire policy, which prevented the dealership from rehiring Helmer. Helmer was offered and accepted a position in the parts department at Kitahara, during which he made approximately $3,200 per month. While at Kitahara, the other parts employees continually asked Helmer questions about his being fired from Bingham, which caused Helmer to relive the termination every day. Helmer subsequently was offered a position at Allstate Insurance as a field adjuster auto technician. Helmer has continued to look for a job in automobile parts because that is what he had done for 18 years and it is in his "blood." Although he has applied for several positions as a parts manager, he has found it difficult to obtain one because he was fired from Bingham, which he indicates on his application.

As a result of what occurred at Bingham, Helmer had a difficult time emotionally—he found it difficult to interact with his daughters because he felt he was unable to fulfill promises he made to them about college. Physically, Helmer had stomach cramps, lost his appetite, and began drinking. He did not seek medical or psychological counseling for these symptoms because he believed that he should "just get over it," and it was a "part of life." Helmer's fiancée, Terri, explained that Helmer was very upset and crying after he was terminated because he did not feel he was able to take care of his family.

Not surprisingly, Clark's version of what was said at his meeting with Helmer is much different from that of Helmer's. According to Clark, Helmer indicated that he needed to earn $57,000 per year. Clark denied that he ever told Helmer he could receive $70,000 in one year while working at Bingham. In addition, Clark denied that Helmer ever told him he needed to earn a minimum of $5,700 per month at Bingham before he would leave his job at Lithia. Clark admitted that he made some calculations using a financial statement in order to assure Helmer that earning $57,000 at Bingham was "doable." Clark also admitted that no one in the parts department had ever made more than $70,000 per year.

Clark agreed that Helmer expressed dissatisfaction about his pay and that he explained to Helmer, " 'You're in the three or four slowest months in the car business. Profits are not like where we would want them to be in October, November, December, January, and things are going to pick up,' and just kind of roll with the flow." Clark expressly denied offering Helmer work in another department to earn extra money.

Clark acknowledged that he asked Helmer to prove the amount of money he earned at Lithia; specifically, that he bring in his W-2 forms. Clark wanted to find out if Helmer was being truthful about his pay at Lithia. Helmer,

according to Clark, could not bring in the W-2, and brought in his pay stubs. Clark claimed that Helmer said, " 'If I don't get X amount of dollars, then I can say I'm going to have to leave.' " Clark subsequently talked with Gist and informed her that he was going to accept Helmer's offer to quit. Clark admitted that Helmer was doing a "good job" and that he did not want to see Helmer leave Bingham, and that the sole reason for Helmer's termination was the disagreement they had over Helmer's pay.

Gist first became aware of Helmer's dissatisfaction with his pay one or two weeks before he was terminated. Clark told Gist that Helmer wanted more money because he had made more money at Lithia. Gist reviewed the documentation provided by Helmer to Clark regarding his pay at Lithia, but she did not believe it. Gist admitted that she interviewed Ingersol prior to Helmer's termination and that Ingersol earns approximately $67,500 per year.

Helmer's economic expert, Ted Vavoulis, explained that, using an annual salary of $70,000 (which Helmer would have earned per year at Bingham), and assuming that Helmer would have worked at Bingham until age 61, Helmer would have earned $896,262. Given his current annual salary of $47,000 at Allstate, his earnings until age 61 will likely total $599,000. The difference between these two salaries is approximately $297,200.

On May 5, 2003, the jury returned a verdict with regard to the liability of Bingham. The jury found that 1) Bingham made a false promise about a material matter; 2) at the time Bingham made the promise it did not intend to perform it; 3) Bingham made the promise with the intent to defraud; 4) Helmer was not aware of Bingham's intention not to perform the promise; 5) Helmer acted in reliance upon the promise; 6) Helmer justifiably relied upon the promise; and 7) Bingham's promise caused Helmer damage. The jury awarded Helmer economic damages in the amount of $490,913 and noneconomic damages in the amount of $50,000. The jury also found by clear and convincing evidence that both Clark and Bingham were guilty of the conduct constituting fraud.

*Punitive damages phase*

Vavoulis testified that in 2002, Bingham's assets were $14.1 million and its liabilities were $6.4 million, leaving a shareholder equity of $7.7 million. Vavoulis estimated that the value of Bingham's goodwill was $4.5 million, which, when added to the equity of $7.7 million, totaled $12.2 million in value.

On May 6, 2003, the jury returned a verdict awarding punitive damages in the amount of $1.5 million.

*Posttrial orders and events*

On July 2, 2003, in response to Bingham's motions for judgment notwithstanding the verdict and for a new trial, the court reduced the punitive damages award against Bingham from $1.5 million to $675,000. The court conditionally denied a new trial if the plaintiff consented to remit the punitive damages award to $675,000, which plaintiff did. In addition, the court ordered the punitive damages award assessed against Bingham only. An amended judgment was filed.

Bingham and Clark filed a notice of appeal and Helmer filed a notice of cross-appeal.

## DISCUSSION

I. *Promissory fraud**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

II. *Compensatory damages**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

A. *Economic damages*

1. *Future lost income and promissory fraud*

The first issue we address is whether a plaintiff who pursues a promissory fraud (or false promise) claim against his employer is entitled to receive economic damages as a result of the income he lost when he left his former employment after being induced to leave by his current employer. This question has not been definitively answered by any California court.

In *Lazar v. Superior Court* (1996) 12 Cal.4th 631 [49 Cal.Rptr.2d 377, 909 P.2d 981], the California Supreme Court alluded to the possibility that a plaintiff could recover damages in a promissory fraud case based on the loss of income from his prior employment. In *Lazar*, the plaintiff asserted a claim for fraudulent inducement of employment contract, alleging that the defendant-employer had contacted him and tried to persuade him to leave his employment in New York and work for the defendant in Los Angeles. (*Id.* at p. 635.) The plaintiff was concerned about relocating because "the move

---

*See footnote, *ante*, page 1121.

would entail relinquishing a secure job as president of the family company where he had worked all his adult life . . . ." (*Ibid.*) Consequently, "[a]s a condition of agreeing to relocate, [the plaintiff] required [defendant-employer]'s assurance that his job would be secure and would involve significant [salary] increases." (*Ibid.*) The defendant-employer represented to the plaintiff that he would continue to be employed as long as he performed his job and achieved goals, and that he would advance within the company and enjoy security and a strong future. (*Id.* at pp. 635–636.) Unfortunately, after the plaintiff relocated and began working for the defendant-employer, he was fired. (*Id.* at pp. 636–637.) The plaintiff sued for lost and future income and employment benefits. (*Id.* at p. 637.) The Supreme Court held that the plaintiff could pursue a cause of action against the defendant-employer under the theory of promissory fraud. In its conclusion, the court noted that the plaintiff could "properly seek damages for the costs of uprooting his family, expenses incurred in relocation, and *the loss of security and income associated with his former employment in New York.*" (*Id.* at pp. 648–649, italics added.) No further explanation was given relating to the damages recoverable by a plaintiff in a promissory fraud case.[2]

In addition, there is one case that addresses whether future lost income is recoverable in an analogous situation. In *Toscano v. Greene Music* (2004) 124 Cal.App.4th 685 [21 Cal.Rptr.3d 732], the plaintiff sued a prospective employer for promissory estoppel[3] stemming from the employer's unfulfilled promise of employment, which had caused the plaintiff to resign from an at-will employment position with his former employer. (*Id.* at p. 689.) The trial court awarded the plaintiff damages that included his lost wages based on what he would have earned from his prior employer to the time of his retirement. (*Ibid.*) The prospective employer appealed. (*Ibid.*) The Court of Appeal recognized that "[n]o California case has squarely addressed the damages question presented: whether a plaintiff who resigns from at-will employment in reliance on an unfulfilled promise of other employment may recover, under a promissory estoppel theory, reliance damages based on wages lost from his or her prior employment." (*Id.* at p. 691.) After reviewing the "equitable underpinnings of the promissory estoppel doctrine," and noting that "[b]ecause the doctrine is equitable in nature, the court should have broad judicial discretion to fashion remedies in the interests of justice," the

---

[2] Some federal courts have interpreted this language as allowing recovery of future lost income in promissory fraud cases. (See e.g., *City Solutions, Inc. v. Clear Channel Communications, Inc.* (N.D.Cal. 2003) 242 F.Supp. 2d 720, 730 & fn. 6, affd. in part and revd. in part by *City Solutions, Inc. v. Clear Channel Communications* (9th Cir. 2004) 365 F.3d 835; *Lamke v. Sunstate Equipment Co., LLC* (N.D.Cal., Sept. 22, 2004, Civ. No. C-03-4956 EMC **4–5) 2004 WL 2125869.)

[3] "The elements of promissory estoppel are (1) a clear promise, (2) reliance, (3) substantial detriment, and (4) damages 'measured by the extent of the obligation assumed and not performed.' [Citation.]" (*Toscano v. Greene Music, supra,* 124 Cal.App.4th at p. 692.)

Court of Appeal held that the plaintiff could recover future wages if they were not speculative or remote and were supported by substantial evidence. (*Id.* at pp. 693, 694–695.) The Court of Appeal then concluded that the evidence of the plaintiff's lost future earnings was "too speculative," because the plaintiff "had [no] definite expectation of continued employment" with his prior employer for any particular time. (*Id.* at p. 696, 21 Cal.Rptr.3d 732.) The court noted that neither the plaintiff nor the defendant had presented testimony from the plaintiff's former supervisor regarding whether the plaintiff would have enjoyed continued employment. (*Ibid.*)[4]

■ In light of these reasons, we hold that future lost income is recoverable on a promissory fraud theory if the damages are not speculative or remote. We disagree with Bingham that *Lazar* holds that future lost income is only available in wrongful termination or breach-of-contract cases, given the court's statement that the plaintiff could recover "the loss of security and income associated with his former employment in New York." (*Lazar v. Superior Court, supra,* 12 Cal.4th at p. 649.) Further, had *Lazar* held as Bingham contends, it would have prevented the Fourth District Court of Appeal in *Toscano* from allowing a plaintiff to recover future lost income in a promissory estoppel case.

■ Stepping back and looking at the situation, it does not make sense to allow a plaintiff to recover future lost income damages in a promissory estoppel case (i.e., *Toscano*) and to not allow the same plaintiff to recover these damages in a promissory fraud case. The elements of both causes of action are virtually identical with the exception of one element. In a promissory fraud case, a plaintiff must establish that the defendant did not intend to perform the promise when it was made. If we were to accept Bingham's position, a plaintiff would not be able to recover lost future income by virtue of having established more egregious behavior. This result is illogical and does not promote public policy.

We also believe that such damages may properly be considered as part of the "benefit of the bargain." Here, the employer made a false promise to induce an act by an employee who otherwise would have stayed in his former job. The employer "bargained" to obtain an employee who already had steady

---

[4] CACI No. 1902 indicates that a plaintiff may recover past and future economic losses, including lost earnings and lost earning capacity, in an action for false promise. Although it is true that the council's verdict forms are only models, it is significant that the council believes these damages are recoverable in a false promise or promissory fraud case. We recognize that this verdict form differs from BAJI No. 16.50.2, which simply asks the jury to decide the "total amount of all damage that was suffered by the plaintiff and that was caused by plaintiff's reliance upon defendant's promise[.]"

employment with another company. It is only fair to compensate the employee for the damages he suffered as a result of leaving that steady employment.

Finally, we conclude that the jury properly awarded Helmer future lost income damages pursuant to the jury instruction explaining that they were permitted to award Helmer reliance damages. "If you find that plaintiff is entitled to a verdict against defendant, you should then award plaintiff damages in an amount that will reasonably compensate plaintiff for all loss or harm provided that you find it was or will be suffered by plaintiff and was caused by defendant's conduct." Bingham did not object to this instruction. The jury could reasonably have concluded that the future lost income Helmer would have earned at Lithia (had it not been for Bingham's wrongful conduct) was permitted pursuant to this instruction.

### 2. Proof of Helmer's lost future income is not speculative or remote

We now consider whether the damages in this case are speculative or remote and conclude there is substantial evidence to support the jury's finding that Helmer was entitled to recover lost future income due to the fraudulent inducement by Bingham and Clark for Helmer to leave his employment at Lithia. Helmer's former supervisor, Ron Kirby, testified that he was "sad" to see Helmer leave and believed that Helmer was a "good" and "reliable" employee. The only reason he did not rehire Helmer after his termination from Bingham was due to a strict no-rehire policy. This testimony establishes that, had Helmer not been induced to leave his employment at Lithia due to the false promise made by Clark regarding his salary, Helmer would have remained employed at Lithia. In Kirby's words, Helmer was a "good" and "reliable" employee and the dealership was sad to see him go. Based on this evidence, the damages are neither speculative nor remote.

### B. Emotional distress damages*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### III. Punitive damages*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante*, page 1121.

## *DISPOSITION*

The judgment is affirmed. Costs are awarded to Helmer.

Harris, Acting P. J., and Dawson, J., concurred.

The petition of defendants and appellants for review by the Supreme Court was denied August 17, 2005. Werdegar, J., did not participate therein.