Filed 1/28/25 (unmodified opinion attached)

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| TODD HEARN,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>PACIFIC GAS & ELECTRIC COMPANY,<br><br>    Defendant and Appellant. | A167742, A167991<br><br>(Napa County<br>Super. Ct. No. 20CV000391)<br><br>**ORDER MODIFYING OPINION<br>  [NO CHANGE IN JUDGMENT]** |

**THE COURT****:**

It is ordered that the dissent portion of the opinion filed herein on January 24, 2025, be modified in the following particulars:

1.    On page 9, the citation to the majority opinion in the second and third lines of the first paragraph shall be modified to read:

(See Maj. opn. *ante*, at p. 18, citing *Lazar*, *supra*, 12 Cal.4th at p. 643; *Hunter*, *supra*, 6 Cal.4th at p. 1178.)

2.    On page 9, the last line of the first paragraph, where citing the majority opinion, shall be modified to read:

*ante*, at p. 18.)

3.    On page 9, the second through fifth sentences of the second paragraph shall be modified to read:

---

* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II.

** Tucher, P.J., Fujisaki, J., and Petrou, J. participated in the decision.

To begin with, I disagree with the majority's assertion that "Hearn's defamation claim was founded on the same conduct—i.e., the creation of the Mar report and its use in his termination—that would form the basis for an ordinary wrongful termination." (Maj. opn. *ante*, at p. 24.) The creation of the Mar report was not the basis for the thoroughly ordinary wrongful termination claim that Hearn brought in this case. He claimed PG&E had wrongfully discharged him in retaliation for his disclosure of suspected safety violations, a violation of Labor Code section 1102.5 completely unrelated to the defamatory statements in the Mar report. The jury found Hearn's discharge was not wrongful in this sense, declining to find PG&E liable for a retaliatory wrongful discharge.

4. On page 10, the first seven lines shall be modified to read:

PG&E also makes no effort to show that Hearn's defamation claim is indistinguishable from any other form of " 'ordinary constructive wrongful termination.' " (*Lazar*, *supra*, 12 Cal.4th at p. 643 [discussing *Hunter*, *supra*, 6 Cal.4th at p. 1184].) The *Hunter* jury found the employer in that case had breached an implied contract not to terminate Hunter's employment without good cause, and it was this contractual right that made Hunter's constructive termination wrongful. (*Hunter*, at pp. 1180, 1184.) Hearn makes no similar

5. On page 10, in footnote 3 the citation to the majority opinion shall be modified to read:

(Cf. Maj. opn. *ante*, at p. 17.)

6. On page 11, in the 1st full paragraph, the citation to the majority opinion shall be modified to read:

(Maj. opn., *ante*, at pp. 4–5, 19–21.)

7. On page 13, in footnote 5 the citation to the majority opinion shall be modified to read:

(Maj. opn. *ante*, at pp. 21–22.)

Dated: January 28, 2025          TUCHER, P.J.
                                 Presiding Justice

_**PG&E v. Hearn**_ **(A162742, A167991)**

3

Trial Court:        Napa County Superior Court

Trial Judge:        Hon. Cynthia P. Smith

Attorneys:

Paul Hastings, Elena Rene Baca, Marisa Michelle Sherman, Sean David Unger, Eric David Distelburger for Defendant and Appellant.

Oliver & Schreiber, Monique Olivier; Costin Law and Anne Casey Costin for Plaintiff and Appellant.

Filed 1/24/25 (unmodified opinion)
**CERTIFIED FOR PARTIAL PUBLICATION\***


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE


| | |
|---|---|
| TODD HEARN,<br><br>        Plaintiff and Appellant,<br>v.<br><br>PACIFIC GAS & ELECTRIC COMPANY,<br><br>        Defendant and Appellant. | A167742, A167991<br><br>(Napa County<br>Super. Ct. No. 20CV000391) |


Todd Hearn sued his former employer, Pacific Gas & Electric Company (PG&E) for retaliation and defamation. The jury found PG&E liable for defamation but rejected Hearn's retaliation claim. On appeal, PG&E contends the trial court erred by denying its motion for judgment notwithstanding the verdict (JNOV) because Hearn's defamation claim was not separately actionable—i.e., the defamation claim was premised on the same conduct that gave rise to his termination and the damages sought were solely related to his loss of employment. In his cross-appeal, Hearn alleges the verdict rejecting his retaliation claim is not supported by sufficient evidence and contends the trial court erroneously excluded relevant evidence.

Tort claims, including defamation, may be brought by former employees against their employers. However, as Hearn's claim for

---

\* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II.

defamation is a claim for wrongful termination by another name, we reverse the trial court's order denying PG&E's JNOV. We otherwise affirm the judgment.

## BACKGROUND

### Factual Background

In 1996, Hearn began working for PG&E as a meter reader. A few years later, he began training as a lineman and completed his apprenticeship in 2004. During the relevant time period, Hearn worked out of PG&E's facility in Napa (the Napa yard).

#### PG&E's Investigation of the Napa Yard

In or around 2016, PG&E became aware of performance issues at the Napa yard, including delays in maintenance and repair projects and rising overtime claims. Roy Surges, PG&E's Electric Superintendent, began working with Tanya Moniz-Witten, a senior director at PG&E, to help address the situation.

In early 2018, Surges noted "excessive meal costs, suspicions of misconduct, a high number of rest periods, poor attendance, schedule performance, multiple retaliatory compliance and ethics complaints, poor moral and bad attitude" among "the bulk" of the senior crew and foreman in the Napa yard. Surges was working with the supervisors to provide "added oversight measures" and brought in corporate security to assist. PG&E began gathering data, including timecards and vehicle GPS records, in order to "deal with" some "bad apples." Moniz-Witten also brought in "HR/Labor" for "advisement and help" in addressing the situation.

By June 2018, PG&E had focused its investigation on the eight employees from the Napa yard charging the most overtime and double time. The investigation was subsequently narrowed down to five of those eight—

2

Hearn was identified as one of the five based on "potentially false time cards." In late June 2018, Hearn and four other linemen were suspended. Hearn was informed he was being placed on "crisis leave" due to an "alarming amount of discrepancies" in Hearn's timecards.

The investigation was transferred to Kevin Cashman, a senior investigator in PG&E's Corporate Security Department (CSD). As part of CSD's investigation, Larissa Ionin, a PG&E internal auditor, analyzed Hearn's timecards between January and May 2018, focusing on overtime and double-time hours. By cross-referencing the timecards with "GPS records" for Hearn's assigned work vehicle, Ionin identified "inconsistencies" related to three locations: Hearn's home, a church, and the home of a co-worker. Ionin found additional discrepancies in overtime claims when she compared arrival times recorded on Hearn's timecards with door-reader access records.

In August 2018, Cashman interviewed Hearn. Hearn was asked about data showing his work vehicle was at home during work hours. Hearn explained he lived a mile away from the Napa yard and went home a lot, as there was an established practice to allow employees "to 'Cab up' " at their home if they lived in the service area. Hearn reported that supervisors did not like crew members to be at the yard when they were not assigned to a specific job, so he would go home rather than driving around while waiting for an assignment. Hearn clarified he only did this during " 'down time' " and never without permission from his foreman. He also reported that he had permission to go home "on an ongoing basis for personal necessities involving bathroom usage," due to a medical condition. Hearn stated PG&E kept changing the rules regarding how to fill out timecards, and his work group had asked for—but not received—training on timecard issues.

In September 2018, a group of PG&E employees met to discuss the status of the CSD investigation. Ionin prepared notes in advance of the meeting, which identified exculpatory issues that had arisen during the investigation, including: (1) there was no written policy that employees were not allowed to go home during the day; (2) employees routinely "cabbed up"; (3) employees were told not to charge "pcc" for down time, causing them to spread that time among jobs; and (4) employees were required to leave the bull room at certain times, therefore necessitating waiting off-site.

PG&E then hired Tony Mar, a retired PG&E Director of Electric Operations, to conduct a separate investigation into the Napa yard. PG&E instructed Mar to examine occasions where work was not completed on time or time was inappropriately recorded. Moniz-Witten and Surges explained to Mar their understanding of the existing problems. While Mar claimed he was not asked to investigate any specific employees, Mar acknowledged he only wrote reports on the five suspended linemen.

Around the time PG&E hired Mar, Cashman was interviewed by Kelly Applegate, an outside investigator brought in by PG&E.[1] Cashman testified he had informed Applegate that individuals were concerned PG&E was "looking at people selectively," and Cashman informed his boss "they want to fire [Hearn] without an investigation." Ionin testified she was aware of at least one other individual who engaged in similar conduct as Hearn but was not under investigation.

Applegate again interviewed Cashman in late November or early December 2018. According to Applegate's notes, Cashman mentioned this " 'just doesn't seem right' " and " 'is the only case that has bothered [him] in 6

---

[1] Her investigation was in connection with retaliation claims, which is discussed in greater detail below.

4

years.' " The notes also reflected that Cashman believed PG&E didn't want to wait for an investigation report to fire Hearn and instead "wanted a termination letter" without an investigation. Cashman disputed the accuracy of these notes during his trial testimony. He stated PG&E simply wanted to receive the investigation results with more expediency.

In early December 2018, Mar informed PG&E he provided Internal Auditing "what we have identified related to Hearn," including that he took multiple trips to his house, claimed overtime when he was not on site, requested unearned meals, and delayed his arrival to work locations.

CSD summarized its investigation and findings in a December 10, 2018 memorandum. Its investigation "revealed unclear feedback loops between management and non-management employees regarding acceptable/unacceptable practices or policies about going home during a work or overtime shift" and recommended PG&E clearly articulate and document those policies. CSD found Hearn violated PG&E's Code of Conduct on two bases: (1) Hearn's claimed time did not correspond to badge swipe records on nine instances; and (2) Hearn inaccurately reported his time records on 11 occasions that either did not involve stops at his home or involved stops exceeding 30 minutes. Despite those violations, CSD "identified significant mitigating factors in this investigation pertaining to ongoing practices and explicit and tacit approvals . . . with regard to what employees were and were not allowed to do when on duty but not actively engaged in specific jobs," along with an informal accommodation for Hearn's unspecified medical condition.

The following day, Mar informed Walt Posey, a director at PG&E, that he had read the CSD report and "our conclusion will be different." Posey responded, "Great." Mar was aware Hearn had supervisor approval to go

5

home, but he would include "verbiage . . . to emphasize the number and durations of [Hearn's] stop at homes."

On December 12, 2018, Mar submitted a memorandum to PG&E management regarding allegations that Hearn falsified timecards and misused company time. Mar summarized investigative findings by members of "Field Operations North," which he referred to as the "LOB [Line of Business] team." Mar reported the LOB team "identified multiple instances" when Hearn did not timely respond to field locations, misstated work activities, falsified timecards, and charged meals he was not entitled to. Mar also reported that the "investigation teams" found Hearn used his company vehicle to go home during regular or overtime work hours on 31 occasions. And Mar reported that although Hearn claimed to have a medical condition, he had not applied for or received formal accommodations. Mar omitted any mention in his report that Hearn received supervisor approval to go home.

Mar presented evidence in the form of bullet-point synopses of several incidents between January and May 2018, when Hearn allegedly engaged in misconduct. For some incidents, little concrete evidence was provided. For example, Mar stated that one day in January Hearn reported eight hours of "straight time charged for inclement weather," when GPS data showed that during that period Hearn was in the vicinity of downtown restaurants and then went home for an hour-and-a-half before returning to the Napa yard four hours later. Mar's report did not record the weather conditions or how they may have affected projects that would otherwise have been undertaken that day. In the conclusion section, Mar stated: "LOB's investigation concluded Hearn violated the PG&E Code of Conduct by misusing company time, company vehicles, misstating his work activities and locations by

6

falsifying his timecards and charging meals that he was not entitled to," and by his "practice of going home 31 times during work hours."

### *The "Tripsaver" Device and Retaliation Investigation*

Hearn presented evidence that beginning in 2017, he repeatedly expressed safety concerns to PG&E management about a device called a "Tripsaver" that PG&E began installing on its electrical lines in 2016. The Tripsaver was being used to automatically restore power to a line after a "fault," thus saving the time and expense of sending a lineman to inspect and repair the problem. Hearn was particularly concerned that Tripsavers were being installed in high fire-risk areas. PG&E Superintendent Roy Surges responded negatively to Hearn and others who raised these safety concerns.

As a result, PG&E retained a lawyer named Kelly Applegate to conduct an external investigation of retaliation claims made by employees against PG&E management, including the report Hearn made during his CSD interview that his superiors retaliated against him. This investigation occurred during the same time period that PG&E was investigating Napa yard employees suspected of misconduct, as discussed above.

About a month after Hearn's CSD interview with Cashman, Applegate interviewed Hearn. Hearn was asked about retaliation, told Applegate about his Tripsaver concerns, and gave her a list of witnesses to contact. Applegate also interviewed Cashman, who shared information about the CSD investigation. Cashman told Applegate that a concern had been raised about whether employees were being selectively targeted for investigation over alleged misconduct. According to Applegate's interview notes, Cashman also made statements to the following effect: he thought "maybe" PG&E supervisors should "work on supervising [linemen] rather than trying to catch them"; this was the only case that had " 'bothered [him] in 6 years' "

7

and didn't " 'seem right' "; another PG&E manager did not want to wait for an investigation report before issuing a termination letter; and Cashman told his boss "they wanted to do this without an investigation."

Following her investigation, Applegate submitted a report in March 2019—she found no evidence Hearn was investigated and terminated because he spoke out about safety concerns or that his supervisor retaliated against him for filing a grievance.[2]

### *Hearn's Termination*

On January 10, 2019, Labor Relations Manager Kathy Ledbetter sent an email to other PG&E managers requesting authorization to terminate Hearn's employment. In her email, Ledbetter repeated investigative findings contained in the CSD and Mar reports. Recipients of Ledbetter's email responded with their approvals.

In a January 18, 2019 letter, PG&E informed Hearn his employment was terminated based on findings of an investigation into his conduct. Hearn was told: "Specifically, it has been determined that you violated the Employee Code of Conduct by misusing company time, misstating work activities, and fraudulent submissions of timecards for overtime compensation resulting in all day rest periods, and delayed service time to customers in violation of the Labor Contract."

### *Procedural Background*

Hearn filed the underlying action against PG&E, alleging four causes of action: (1) retaliation for disclosing the company's safety violations (Lab. Code, § 1102.5); (2) retaliation for lodging a bona fide complaint about unsafe working conditions (Lab. Code, § 6310); (3) wrongful termination in violation

---

[2] Applegate did not testify at Hearn's trial. Her report was marked as a trial exhibit, but does not appear to have been offered into evidence.

8

of public policy; and (4) defamation. Hearn's first three claims were based on allegations that he reported various safety concerns (e.g., Tripsavers were unsafe; PG&E had downgraded dangerous issues with its power lines to save money on overtime labor; and PG&E did not have an adequate safety plan to address known and expected dangerous fire conditions), and was retaliated against for expressing such concerns by being suspended and ultimately fired.

In connection with his defamation claim, Hearn alleged various PG&E employees made false (defamatory) statements—that he misused company time, misstated his work activities, and fraudulently submitted timecards—in the CSD and Mar reports, Ledbetter's January 2019 email, and the January 2019 employment termination letter. Hearn alleged PG&E terminated his employment due to these false statements, and he was forced to repeat these defamatory statements to prospective employers who asked why he no longer worked for PG&E. Hearn alleged that publication of these statements caused him harm, including harm to his reputation, trade, profession, and occupation.

### *PG&E's Motion for Summary Adjudication*

In January 2022, PG&E moved for summary adjudication of Hearn's defamation claim, raising three material arguments. First, the allegedly defamatory statements were covered by the statutory "common interest" privilege (Civ. Code, § 47, subd. (c)) because they were internal company communications between individuals with a common interest in the investigation of an employee's conduct, and there was no evidence of malice to defeat the privilege. Second, Hearn consented to republication of the statements to outsiders by sharing his story with the San Francisco Chronicle. Finally, Hearn could not prove any damages as there was no

9

evidence that Hearn's republication of allegedly defamatory statements "was the reason he was not hired for" other jobs.

The court denied PG&E's motion. The court found Hearn conceded the allegedly defamatory statements were conditionally privileged but produced evidence to raise a triable issue of material fact as to whether Mar acted with malice when he published his report. (See Civ. Code, § 47, subd. (c) [common interest privilege applies to communications made "without malice"].) The court also rejected PG&E's consent defense because Hearn's claim arose from PG&E's original publication of the allegedly defamatory statements, at which time Hearn had not yet disclosed the statements to the media. Finally, PG&E's contention that there was no triable issue as to damages was based on an erroneous assumption that Hearn's claim for damages stemmed solely from allegations that prospective employers elected not to hire him. The court noted Hearn alleged he suffered damages " 'including wage loss, benefit loss, and emotional distress" because of the Mar report. These allegations, the court concluded, "support a claim that some or all of Plaintiff's alleged damages relate to his termination from PG&E and that the termination was proximately caused by the allegedly defamatory communications."

### *Trial Proceedings*

At the outset of trial, Hearn dismissed one of his statutory retaliation claims and his claim for wrongful termination in violation of public policy. He proceeded to trial on his claims for retaliation in violation of Labor Code section 1102.5 (section 1102.5) and defamation.

Hearn's defamation and retaliation claims were tried to a jury over multiple days. The court used modified CACI instructions to instruct the jury regarding the elements of Hearn's claims and PG&E's defenses thereto. As to the defamation claim, the jury was instructed with CACI 1704—the

10

jury was to first determine whether PG&E was liable for defamation, and, if it found liability, Hearn was entitled to recover damages if he proved that PG&E's defamatory conduct was a substantial factor in causing harm to Hearn's property, business, trade, profession or occupation, and/or in causing him shame mortification or hurt feelings.

The jury also received instruction regarding damages set forth in the CACI 3900 series. Specifically, it received the following instructions: CACI 3900—if Hearn proved his claim, he was entitled to compensation for each item of harm caused by PG&E's wrongful conduct; CACI 3902—Hearn was seeking both economic and noneconomic damages; a modified version of CACI 3903P—Hearn's alleged economic damages included lost earnings, which were compensable if he proved either his defamation claim or his retaliation claim; and CACI 3934—although Hearn sought damages under two distinct legal theories (retaliation and defamation), each item of damages could only be awarded once.

Following deliberations, the jury found PG&E not liable for retaliation but liable for defamation.

As to Hearn's claim that PG&E retaliated against him in violation of section 1102.5, the jury found Hearn (1) disclosed certain events or occurrences to a superior or person with investigative authority, and (2) Hearn had reasonable cause to believe that the information he disclosed constituted a violation of state or federal safety regulations. However, the jury found PG&E did not take "adverse employment action(s)" against Hearn because of these disclosures.

In connection with Hearn's defamation claim, the jury declined to find liability for three of the four documents at issue (the CSD report, Ledbetter's email, and the employment termination letter). In connection with these

11

three documents, the jury found the actionable statements substantially true. However, the jury found Hearn proved his defamation claim as to the Mar report. Specifically, the jury found (1) the actionable statements *not* substantially true, and (2) Mar acted with malice. By making these findings, the jury rejected PG&E's common interest privilege defense and found that Hearn had established the defamatory statements were made with malice. (Civ. Code, § 47, subd. (c).)

The jury awarded damages totaling $2,160,417, comprised of separate awards as to past and future economic and non-economic damages. The verdict form did not ask the jury to consider or award any assumed reputational harm damages. The jury declined to award punitive damages.

The trial court subsequently entered judgment in favor of PG&E on Hearn's cause of action for retaliation in violation of section 1102.5, and in favor of Hearn on his cause of action for defamation. The judgment provides that Hearn shall recover from PG&E damages totaling $2,160,417, with interest from the date of entry of judgment.

Following entry of judgment, PG&E moved for JNOV on the ground that Hearn waived his defamation claim before the matter was submitted to the jury by conceding his damages from loss of employment were the same as his defamation damages. PG&E argued Hearn could not pursue a tort claim that was based on the same conduct which formed the basis for his wrongful termination claim and alleged no injury apart from his termination. Hearn opposed the motion. He asserted employers are not immune from tort damages, the jury properly followed the damages instructions agreed upon by the parties, and lost earnings are a proper measure of damages for defamation.

12

The trial court denied PG&E's motion. The court observed PG&E was "rais[ing] a narrow issue, namely, may an employee sue in tort for the same alleged injury that forms the basis of the employee's wrongful termination claim." The court answered this question in the negative. It explained that, based on past California Supreme Court authorities, "where the tort claims arose from the same conduct forming the basis of the breach of contract claims . . . , the Court struck the tort claims. When the tort claims arose from conduct distinct from the breach of contract claims . . . , the tort claim survived." Here, the trial court noted, Hearn "did not bring a claim for breach of contract" and "never stated that his defamation damagers were the same as breach of contract damages" or "admit[ted] that the injuries he suffered were the same as any breach of contract damages he might have suffered." The court thus concluded because Hearn was "able to prove all of the elements of defamation," he was entitled to recover allowable damages.

PG&E timely appealed.

## DISCUSSION

### I.  PG&E's Appeal from Denial of JNOV[3]

PG&E's sole contention on appeal is that the trial court erred by denying its motion for JNOV. Specifically, PG&E contends Hearn is precluded from suing in tort—i.e., bringing a defamation claim—for the same harm he claims arose from his termination.

#### A.  Standard of Review

" 'A motion for judgment notwithstanding the verdict may be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence in support.'

---

[3] PG&E filed separate appeals from the judgment and a postjudgment cost order, which were consolidated pursuant to the parties' stipulation.

[Citations.] On appeal from the denial of a motion for judgment notwithstanding the verdict, we determine whether there is any substantial evidence, contradicted or uncontradicted, supporting the jury's verdict. [Citations.] If there is, we must affirm the denial of the motion. [Citations.] . . . If the appeal challenging the denial of the motion for judgment notwithstanding the verdict raises purely legal questions, however, our review is de novo." (*Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1138; see *Cleveland v. Taft Union High School Dist.* (2022) 76 Cal.App.5th 776, 803.)

Whether a plaintiff is entitled to damages is a question of law subject to de novo review while the amount of damages awarded is a fact question reviewed under the substantial evidence standard. (*Bermudez v. Ciolek* (2015) 237 Cal.App.4th 1311, 1324.) Here, we apply de novo review as the appeal raises purely legal issues regarding Hearn's entitlement to a particular measure of damages.

**B. Analysis**

The trial court properly identified the question as whether an employee may sue in tort for the same conduct that forms the basis for that employee's wrongful termination claim. And this is the question PG&E asks us to resolve on appeal: "In a wrongful termination case, can a plaintiff recover in tort based on the same underlying harm as caused by the discharge?" As we explain below, the trial court erred in its analysis of applicable California Supreme Court authority.

The California Supreme Court has delineated the ability of a terminated employee to recover tort damages in three key cases: *Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654 (*Foley*), *Hunter v. Up-Right, Inc.* (1993) 6 Cal.4th 1174 (*Hunter*), and *Lazar v. Superior Court* (1996) 12

14

Cal.4th 631 (*Lazar*).  In *Foley*, the court considered in part whether a terminated employee could bring a cause of action for tortious breach of the implied covenant of good faith and fair dealing.  (*Foley*, at p. 682.)  In considering whether to extend tort remedies for a contractual breach, the court noted the duty of good faith and fair dealing is imposed by contract and "compensation for its breach has almost always been limited to contract rather than tort remedies."  (*Id.* at p. 684.)

The court ultimately declined to expand available remedies for wrongful discharge to include tortious breach of the implied covenant of good faith and fair dealing.  (*Foley*, *supra*, 47 Cal.3d at p. 692.)  In so holding, the court noted "the employment relationship is fundamentally contractual," and it is "important that employers not be unduly deprived of discretion to dismiss an employee by the fear that doing so will give rise to potential tort recovery in every case."  (*Id.* at p. 696.)  The court concluded by explaining, "we believe that focus on available contract remedies offers the most appropriate method of expanding available relief for wrongful terminations. The expansion of tort remedies in the employment context has potentially enormous consequences for the stability of the business community."  (*Id.* at p. 699.)

In *Hunter*, *supra*, 6 Cal.4th 1174, the California Supreme Court applied *Foley* to consider whether a former employee was precluded from recovering "tort damages for fraud and deceit predicated on a misrepresentation made to effect termination of employment."  (*Id.* at p. 1178.)  The court concluded *Foley* precluded such relief.  It first noted three key practical considerations raised by *Foley* regarding the use of tort remedies in employment termination cases: (1) such remedies "would unduly deprive employers of discretion to dismiss employees by raising fears that any dismissal might lead to tort

15

recovery;" (2) "we doubted whether a rule could be formulated that would assure that only 'deserving' cases give rise to tort relief: virtually any termination could provide the basis for an allegation that the employee's discharge was in bad faith;" and (3) "the expansion of tort remedies in the employment context carried potentially enormous consequences for the stability of the business community." (*Hunter*, at p. 1181.)

Applying those concerns, the *Hunter* court concluded "the Court of Appeal erred in inferring that an employer that misrepresents a fact in the course of wrongfully terminating an employee has committed a fraud." (*Hunter, supra,* 6 Cal.4th at p. 1184.) Although the court of appeal concluded the employee "established each of the elements of fraud," "[t]he problem with the Court of Appeal's analysis is that the result of [the employer's] misrepresentation is indistinguishable from an ordinary constructive wrongful termination. . . . [The employer] simply employed a falsehood to do what it otherwise could have accomplished directly." (*Ibid.*) In other words, "such misrepresentations are merely the means to the end desired by the employer, i.e., termination of employment. They cannot serve as a predicate for tort damages otherwise unavailable under *Foley*." (*Hunter*, at p. 1185.)

In *Lazar*, *supra*, 12 Cal.4th 631, the California Supreme Court distinguished *Hunter*. It noted *Hunter* "expressly left open . . . the possibility 'that a misrepresentation not aimed at effecting termination of employment, but instead designed to induce the employee to alter detrimentally his or her position in some other respect, might form a basis for a valid fraud claim even in the context of a wrongful termination.' " (*Lazar*, at p. 640.) The court explained the outcome in *Hunter* was based on the misrepresentation being " 'the means to the end desired by the employer, i.e., termination of employment,' " but would "not preclude tort recovery in every case involving a

16

termination." (*Lazar*, at pp. 640, 643.) The court further explained: "While in previewing our rationale in *Hunter*, we indicated it would support tort recovery 'only' with respect to a misrepresentation that is 'separate from the termination of the employment contract' [citation], we did not mean thereby to suggest that simply effecting a termination in conjunction with fraudulent conduct will insulate an employer from an otherwise properly pled fraud claim. We meant, rather, to preclude fraud recovery only where 'the result of [the employer]'s misrepresentation is indistinguishable from an ordinary constructive wrongful termination.' " (*Lazar*, at p. 643.)

The *Lazar* court thus found "[t]he misrepresentations Lazar alleges were not aimed at effecting his termination, but, rather, at inducing him to accept [the defendant's] offer of employment." (*Lazar*, *supra*, 12 Cal.4th at p. 640.) Specifically, it noted Lazar's fraud claim arose from the company's misrepresentation to induce Lazar to leave his prior employment, and thus "was not made in the course of Lazar's termination." (*Id*. at p. 643.) The court concluded that, on his fraud claim, Lazar could "properly seek damages for the costs of uprooting his family, expenses incurred in relocation, and the loss of security and income associated with his former employment in New York." (*Id*. at pp. 648–649.) It stated, however, that Lazar was required to "rely on his *contract* claim for recovery of any loss of income allegedly caused by wrongful termination of his employment with" the defendant. (*Id*. at p. 649.)

Together, *Foley*, *Hunter*, and *Lazar* provide guidance for when a terminated employee may recover tort damages from his or her former employer. As a fundamental matter, these cases recognize employees may generally assert tort claims against their employer, even in the context of their termination. (*Lazar*, *supra*, 12 Cal.4th at p. 640 [" 'a misrepresentation

17

not aimed at effecting termination of employment, but instead designed to induce the employee to alter detrimentally his or her position in some other respect, might form a basis for a valid fraud claim even in the context of a wrongful termination.' "]; *Hunter*, *supra*, 6 Cal.4th at p. 1185 [same].)

But *Foley*, *Hunter*, and *Lazar* set forth parameters that may limit an employee's ability to obtain damages from such torts within an employment termination context. Specifically, the California Supreme Court has specified two hurdles employees must overcome: (1) such tort claims must be based on conduct other than that giving rise to the employee's termination (e.g., *Lazar*, 12 Cal.4th at p. 643 [holding in *Hunter* was "to preclude fraud recovery only where 'the result of [the employer]'s misrepresentation is indistinguishable from an ordinary constructive wrongful termination.' "]); and (2) the damages sought cannot exclusively " 'result from [the] termination *itself*.' " (*Lazar*, at p. 643; see also *Hunter*, *supra*, 6 Cal. 4th at p. 1178 [same]; accord *Rattagan v. Uber Technologies, Inc*. (2024) 17 Cal.5th 1, 21 ["defendant's conduct must have caused injury to persons or property that was not reasonably contemplated by the parties when the contract was formed."].) We do not interpret this second factor as requiring a plaintiff to allege damages uniquely specific to defamation; it merely requires that the damages resulting from any alleged defamation cannot arise exclusively from his or her termination.

Based on these principles, the trial court erred in denying PG&E's JNOV because Hearn may not recover for defamation when it arose from the same conduct giving rise to his termination and the only result is the loss of his employment. In other words, Hearn cannot recover damages for wrongful termination by recasting his claim as one for defamation.

18

The jury found Hearn's defamation claim arose solely from the Mar report. At least a year prior to Hearn's termination, PG&E initiated an investigation regarding suspected employee violations of its Code of Conduct. Approximately six months before his termination, Hearn and four other employees were placed on "crisis suspension" due to significant evidence of violations—all of whom were subsequently terminated. After the suspension, the investigation was limited to the suspended employees and was only being conducted by CSD. However, during CSD's investigation, Cashman indicated to PG&E that he believed there were numerous challenges in finding Code of Conduct violations, including the existence of various mitigating factors. In response, PG&E retained Mar to conduct a separate investigation into Hearn and the other suspended employees regarding the same issues. In communications between Mar and PG&E, Mar acknowledged certain mitigating factors applied to Hearn but assured them his report would "have verbiage" that emphasized Hearn's alleged misconduct. He also informed PG&E that his "conclusion will be different" from the CSD report after the CSD report failed to substantiate many alleged violations and listed mitigating factors; PG&E responded, "Great." Once Mar's report was finalized, it was circulated within PG&E, and Hearn was terminated within the month.

The record thus indicates PG&E's conduct following Hearn's suspension was primarily aimed at documenting and substantiating the findings that led to Hearn's suspension. That process resulted in the Mar report, and Hearn was terminated based on Code of Conduct violations outlined in that report. The defamatory statements contained in the Mar report were generated within the scope and context of Hearn's disciplinary proceedings and termination, and both the defamation claim and Hearn's

19

termination arose from the same conduct—i.e., issuance of the Mar report. Simply put, the Mar report was the vehicle by which PG&E effectuated Hearn's termination.

This conclusion is bolstered by the fact that PG&E's termination email and termination letter utilized substantively identical language to that contained in the Mar report. The Mar report stated Hearn "violated the PG&E Code of Conduct by misusing company time, misstating his work activities, falsifying time cards and charged meals that he was not entitled to." PG&E's email requesting authorization to termination Hearn adopted this language verbatim: Hearn "violated the PG&E Code of Conduct by misusing company time, misstating work activities, falsifying time cards and charged meals that he was not entitled to." PG&E's official termination letter to Hearn likewise utilized substantially identical language, stating Hearn "violated the Employee Code of Conduct by misusing company time, misstating work activities, and fraudulent submissions of timecards . . . ."

In connection with these three documents, the jury was asked to evaluate whether four identical statements gave rise to defamation: "a. That Mr. Hearn had violated PG&E's Employee Code of Conduct; [¶] b. That Mr. Hearn had misused company time; [¶] c. That Mr. Hearn had misstated his work activities; and/or [¶] d. That Mr. Hearn falsified his timecards." The jury found these statements substantially true as to the termination email and termination letter, but not substantially true as to the Mar report. This disconnect—how the jury could find identical statements both true and untrue—is not addressed by the parties, and we do not speculate on the jury's reasoning. However, these incongruent findings further support our conclusion that the harm Hearn alleged was indistinguishable from what

20

would otherwise be an ordinary wrongful termination claim based on his Code of Conduct violations.

Moreover, the damages arising from PG&E's defamation were solely related to Hearn's termination. The record indicates Hearn declined to seek damages relating to any reputational injury distinct from his loss of employment. While defamation may generally give rise to an assumption of reputational harm, Hearn did not request that the jury award assumed damages and agreed to remove the paragraph on assumed damages from CACI 1704. Specifically, during the parties' discussion of CACI 1704, plaintiff's counsel agreed with the court's representation that "they're seeking the same damages" for both claims "[b]ecause all of the damage to [Hearn] stemmed from his termination." When, PG&E's counsel then asked, "So . . . [Hearn] can't claim any reputational harm," Hearn's counsel responded that they "have not submitted a separate category of reputation harm" in the jury instructions. PG&E then noted CACI 1704 included "harm to [Hearn's] reputation. In response, Hearn's counsel stated: "Let's remove the final paragraph of 1704 where it says, 'assumed damages,' and the text that is underneath that and then the matter will be addressed." The parties stipulated to Hearn's proposal and, as a result, the jury was not instructed on assumed damages, and they were not asked to make findings or award any damages based on any assumed reputational harm. Likewise, Hearn did not seek any damages separate from his loss of employment, such as damages arising from republication to third parties. Accordingly, the only damages alleged " 'result[ed] from [the] termination itself.' " (*Lazar*, *supra*, 12 Cal.4th at p. 643; *Hunter*, *supra*, 6 Cal.4th at p. 1178.)

The dissent does not address the discordance of allowing an employee who has failed to prove wrongful termination to then recover termination

21

damages, and only termination damages, via another label. Had Hearn identified harm unrelated to his termination, our conclusion may have differed. For example, in *Gould v. Maryland Sound Industries, Inc.* (1995) 31 Cal.App.4th 1137, 1154, the court found defamation to be an "independent tort" because it was based on a statement that the employee made a significant error in preparing a bid, whereas his wrongful termination claim was based on retaliation and an attempt to avoid paying earned commissions.[4] Similarly, in *King v. U.S. Bank National Assn.* (2020) 53 Cal.App.5th 675, the court of appeal upheld jury verdicts for both defamation and wrongful termination. (*Id.* at pp. 700, 705.) However, the defamation claim was premised on "false statements made by subordinates to human resources and human resources' subsequent republication of those false accusations of misconduct to other employees," whereas the wrongful termination was motivated by the defendant's "desire to deprive King of the bonus he had earned." (*Id.* at pp. 700, 704.) Hence, the plaintiffs in these cases could pursue both claims because the defamatory statements at issue were not a basis for the plaintiffs' subsequent terminations.

But here, the fact pattern is analogous to those cases in which courts have found tort claims barred because they arise from the same conduct underlying the employees' terminations and only seek damages related to loss of employment. (See, e.g., *Hunter*, *supra*, 6 Cal.4th at pp. 1184–1185 [employer fraudulently induced Hunter to resign in order to effectuate his termination]; *Soules v. Cadam, Inc.* (1991) 2 Cal.App.4th 390, 403–404 (*Soules*), disapproved on another ground in *Turner v. Anheuser–Busch, Inc.*

---

[4] *Agarwal v. Johnson* (1979) 25 Cal.3d 932, cited by Hearn, is inapplicable to our analysis because it only addressed whether substantial evidence supported a finding of malice. (*Id.* at p. 945.) Here, the question of malice was resolved by the jury and has not been challenged on appeal.

(1994) 7 Cal.4th 1238 [employee barred from tort recovery because claims, including defamation, were "founded on defendant's conduct which formed the basis of the causes of action for wrongful constructive discharge in breach of the contract of employment and the implied covenant of good faith and fair dealing: evaluating plaintiff's job performance and demoting her."]; *Hine v. Dittrich* (1991) 228 Cal.App.3d 59, 61, 64 (*Hine*) [employee was fired for refusing to attend a company meeting based on the presence of another employee; court held employee could " 'no more turn a contractual wrongful discharge action into a negligent supervision tort claim' " because he "suffered no injury independent of his termination."].)[5]

In response, Hearn argues Civil Code section 47 provides the exclusive limit to an employee's ability to bring a defamation claim. He contends once an employee demonstrates liability and malice, they are statutorily entitled to recover any and all tort damages. Yes, Civil Code section 47 contains a statutory limit on such actions, and Hearn has proven that limit inapplicable based on the jury's malice finding. But Civil Code section 47 does not contain any language indicating the Legislature intended it to be the exclusive limit on such actions. Nor does Hearn cite any authority suggesting as much.

In reaching our conclusion, we do not question whether Hearn proved all elements of a defamation claim. The jury found he did so, and PG&E has not challenged that aspect of the jury verdict on appeal. Likewise, PG&E has not challenged the jury instructions and cannot allege error based on the

---

[5] While the California Supreme Court in *Lazar* criticized *Soules* and *Hine* for "the sometimes sweeping analyses or conclusions" contained therein, the court did not identify which parts of those opinions it was referencing. (*Lazar*, *supra*, 12 Cal.4th at p. 648.) Nor did the court appear to disagree with *Soules*'s critique of "the use of pleading artifice to relabel a deficient breach of contract claim." (*Lazar*, at p. 648.)

accuracy of those instructions. But whether Hearn proved all elements of defamation or whether the jury was appropriately instructed is not relevant to the question posed here—whether the defamatory statements are separately actionable or instead " 'merely the means to the end desired by the employer, i.e., termination of employment.' " (*Lazar*, *supra,* 12 Cal.4th at p. 640; accord *Hunter*, *supra,* 6 Cal.4th at p. 1184 [whether tort "indistinguishable from an ordinary constructive wrongful termination."].) And the record indicates the defamatory statements here are not separately actionable. Hearn's defamation claim was founded on the same conduct—i.e., the creation of the Mar report and its use in his termination—that would form the basis for an ordinary wrongful termination claim based on Code of Conduct issues, and sought the same damages—i.e., loss of employment. (*Hunter*, at p. 1178; *Lazar*, at p. 647 ["Since 'the result of Up-Right's misrepresentation [in *Hunter* was] indistinguishable from an ordinary wrongful termination' [citation], *Foley*'s 'logic' . . . became pertinent."].)

The dissent disagrees with our analysis because Hearn's defamation claim is not based on the same conduct as his wrongful termination claim— i.e., Hearn's wrongful termination claim was based on retaliation, whereas his defamation claim was based the creation of the Mar report and its use in his termination. (Dis. opn., *post*, at p. 9.) But Hearn's failure to allege a second wrongful termination claim based on the Mar report does not impact our analysis. If Hearn believed he was entitled to damages exclusively caused by his termination, he was required to pursue those damages via a wrongful termination claim.

"[W]here the jury's special verdict for the plaintiff is based on conduct that does not constitute an actionable tort, that verdict cannot stand." (*Drink Tank Ventures LLC v. Real Soda in Real Bottles, Ltd*. (2021) 71 Cal.App.5th

24

528, 533.)  Accordingly, we reverse the judgment entered in Hearn's favor on his defamation cause of action.  The costs award premised on Hearn prevailing consequently is likewise reversed.[6]

## II.  Hearn's Cross Appeal

Hearn contends the judgment in favor of PG&E on Hearn's cause of action for retaliation in violation of section 1102.5 must be reversed because the verdict is not supported by substantial evidence, and the trial court erroneously excluded evidence that was relevant to prove this claim.

### A.  Hearn's Substantial Evidence Challenge

Hearn seeks a retrial of his retaliation claim on the theory there is no substantial evidence to support the jury's finding, on the special verdict form, that Hearn failed to prove "PG&E took adverse employment action(s) against him."  There are several flaws in this argument.

First, Hearn misstates the standard of review.  Ordinarily, we review a jury's factual findings for substantial evidence, and reverse a jury verdict only if it is not supported by substantial evidence.  (*Mathews v. Happy Valley Conference Center, Inc.* (2019) 43 Cal.App.5th 236, 251.)  But here, Hearn disputes a finding that he failed to meet his burden of proof at trial.  "As the plaintiff who failed to prevail before a jury, [Hearn] faces an extremely high

---

[6] We note that California Employment Law Counsel and Employers Group have filed an amicus brief that challenges the defamation verdict on the ground that the jury's malice findings could undermine important protections authorizing workplace investigations.  Generally, appellate courts " ' " ' "will consider only those questions properly raised by the appealing parties.  Amicus curiae must accept the issues made and propositions urged by the appealing parties, and any additional questions presented in a brief filed by an amicus curiae will not be considered." ' " ' " (*Washoe Meadows Community v. Department of Parks & Recreation* (2017) 17 Cal.App.5th 277, 291.)  We follow that rule here in declining to address amici's fact-based challenge to the judgment.

25

burden on appeal." (*Estes v. Eaton Corp.* (2020) 51 Cal.App.5th 636, 651 (*Estes*).) " 'In a case where the trier of fact has determined that the party with the burden of proof did not carry its burden and that party appeals, "it is misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment." [Citations.] Instead, "where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence *compels a finding in favor of the appellant as a matter of law.*" ' " (*Ibid.*) And in conducting this review, we resolve all conflicts in favor of the prevailing defendant and draw all inferences in support of the judgment. (*Ibid.*)

Second, Hearn makes no effort to carry this burden and implicitly acknowledges he cannot. Hearn's argument focuses on a single factual finding in the section of the special verdict form addressing his retaliation claim, not on the retaliation claim in its entirety. Hearn contends there is no evidence to support the jury's finding that he suffered no adverse employment action because the trial evidence all "confirms that PG&E terminated Hearn's employment, a per se 'adverse action.' " But if there was no dispute for the jury to resolve as to whether Hearn's employment termination constituted an adverse employment action, Hearn could have requested an instruction to that effect, or could have framed a special verdict form that posed only contested issues. Because the jury was instead given a special verdict form that it filled out in a manner he contends is not supported by the evidence, Hearn now faces an " 'almost impossible' " standard; he must show that the trial evidence compels a verdict in his favor on the retaliation cause of action *as a matter of law*. (*Estes, supra,* 51 Cal.App.5th at p. 651; see also *Ajaxo, Inc. v. E\*Trade Financial Corp.* (2020) 48 Cal.App.5th 129, 163–164 [collecting cases].) The jury ceased

26

deliberations without making any findings on the contested issue of whether Hearn's disclosures of what he reasonably believed to be safety violations were a contributing factor in PG&E's decision to terminate his employment. Hearn tells us, "[t]he jury heard compelling evidence in Hearn's favor" on this issue, and it was "therefore, 'reasonably probable a result more favorable to [him] would have been reached' " if the jury had not mistakenly answered the special interrogatory. Even if true, that is not enough. Hearn has not established, and does not contend, that he is entitled as a matter of law to prevail on his retaliation claim. (See *Estes*, at p. 651 [reviewing courts " 'must resolve all conflicts in the evidence in favor of the prevailing party and must draw all reasonable inferences in support of the trial court's judgment' "].)

Finally, Hearn invokes a nonexistent remedy in seeking a retrial here. In a case where the appellate court concludes the evidence is insufficient to support a judgment, the proper remedy is to reverse the judgment and direct that judgment be entered in favor of the appellant. (*Copenbarger v. Morris Cerullo World Evangelism, Inc.* (2018) 29 Cal.App.5th 1, 16.) Had Hearn proven he was entitled to judgment as a matter of law on his retaliation claim, we could consider this course. But Hearn asks for a different remedy, namely that we reverse the judgment on this claim and remand with directions for a retrial on the section 1102.5 claim. We know of no authority, nor has Hearn cited us any in his appellate briefs or during oral argument, that would countenance retrial as a remedy for a successful appeal on grounds of insufficient evidence to support the verdict.

## B. Evidentiary Rulings

Hearn contends he was prejudiced by two in limine orders. We review the challenged orders for abuse of discretion. (*McMillian Companies, LLC v. American Safety Indemnity Co.* (2015) 233 Cal.App.4th 518, 529.)

### 1. Cause of Tubbs Fire

Prior to trial, PG&E moved for an order precluding Hearn from speculating about the cause of an October 2017 fire in Sonoma County that is commonly referred to as the Tubbs Fire, or from disputing a determination by fire investigators that PG&E did not cause that fire. Hearn opposed the motion, arguing there was evidence he had shared with PG&E his opinion that its defective equipment caused the Tubbs Fire, and this evidence was relevant to prove his retaliation claim.

The court prefaced its rulings by questioning whether Hearn truly reported to PG&E that he believed its equipment caused the Tubbs fire.[7] There was no allegation about the fire in Hearn's complaint and his deposition testimony was "all over the place," the court observed. Hearn's counsel argued the deposition testimony was sufficient to put at issue the question whether PG&E retaliated against Hearn because he expressed that PG&E caused the Tubbs fire. PG&E disagreed, and argued it would be severely prejudiced should Hearn be permitted to pursue this new "toxic allegation" without giving PG&E notice and additional time to prepare a case showing that it did not cause the Tubbs fire. During extensive back and forth argument, Hearn's counsel balked at the suggestion of a continuance, stating they would live with a ruling limiting Hearn's testimony on the subject.

---

[7] On appeal, Hearn insists that he told Roy Surges and another Supervisor that PG&E started the Tubbs fire, but Hearn's citations to documents in his Respondent's Appendix do not support this assertion.

Hearn's counsel also acknowledged that Hearn was *not alleging* PG&E retaliated against Hearn because he claimed that PG&E caused the Tubbs fire. Instead, counsel argued that evidence of Hearn's accusations that PG&E caused the fire was relevant "context," to explain why PG&E would retaliate against him for raising related safety concerns. PG&E renewed its strong objection, arguing relevance and prejudice. Ultimately, the court agreed with PG&E, precluding Hearn and his witnesses from testifying that Hearn complained to PG&E that he thought PG&E was at fault in igniting the Tubbs fire and/or that the fire investigator's conclusion was wrong. Hearn also was precluded from testifying that he thought PG&E's equipment caused the fire. The court ruled all this evidence had nominal probative value, was highly prejudicial, and was likely to be very confusing to the jury.

On appeal, Hearn contends the trial court abused its discretion because the excluded evidence "tended to prove . . . that he had a reasonable belief that PG&E violated the law." We are not persuaded. The trial court acknowledged the nominal probative value of evidence indicating Hearn thought PG&E responsible for the fire, but concluded reasonably that this value was outweighed by the prejudicial nature of the testimony and the confusion—and perhaps delay—such evidence would cause. Permitting Hearn to share his unproven accusations could have tempted the jury to punish PG&E for causing the fire, even if the fire had nothing to do with the decision to terminate Hearn. And it could have led to a time-consuming and confusing collateral proceeding about the cause of the Tubbs fire. Hearn fails to address these relevant considerations, and we find no abuse of discretion in the challenged ruling.

29

## 2. Applegate Notes

Prior to trial, PG&E moved to exclude evidence of notes that Kelly Applegate recorded while interviewing witnesses during her investigation of retaliation claims made by employees at the Napa yard. PG&E argued those notes were inadmissible hearsay and irrelevant. Opposing this motion, Hearn argued the notes were relevant to Hearn's retaliation claim because they confirmed he had made safety complaints, and to his defamation claim because they were evidence of malice. Hearn also invoked multiple hearsay exceptions, contending Applegate's notes were business records, and statements by witnesses she interviewed were "authorized admissions" and admissible to prove the speaker's state of mind.

The court ruled that Applegate's notes were business records, but it declined to make a blanket ruling about their admissibility because, for any given statement by an interviewee, there could be second-level hearsay problems. The court also clarified that Hearn could potentially obtain the same evidence a different way, for example, by asking an interviewee directly. With these guidelines, the court heard argument about the admissibility of specific statements Applegate recorded during her interviews of Cashman and Ionin. It then rejected Hearn's arguments that these statements were party admissions or state of mind evidence probative of malice. However, the court found Applegate's notes could be admissible impeachment evidence. Consistent with this ruling, when Cashman testified at trial Hearn impeached him with Applegate's notes, excerpts of which were admitted into evidence.

On appeal, Hearn contends the trial court committed reversible error by failing to admit Applegate's notes as business records, but Hearn fails to address the court's actual rulings. Even when Hearn pivots from contending

30

the notes were admissible wholesale to focusing on statements attributed to Cashman and Ionin, he fails to address specific hearsay issues attendant to specific statements, and therefore fails to show that any specific statement was erroneously excluded.  And, as to the notes from the Cashman interview in particular, Hearn's appellate argument implausibly asserts reversal of the judgment is required because he was precluded from using the interview notes "throughout the presentation of his case," even though relevant excerpts were admitted before the case went to the jury.  (Italics omitted.)

### 3. *Prejudice*

To obtain a reversal "based on the erroneous exclusion of evidence," Hearn must "show a 'miscarriage of justice,' meaning that 'a different result was probable if the evidence had been admitted.' " (*P&D Consultants*, *Inc. v. City of Carlsbad* (2010) 190 Cal.App.4th 1332, 1348.)  Hearn fails to make that showing here.  To the extent Hearn sought to admit the Tubbs fire evidence as proof that he reported safety violations, he proved this at trial without the excluded evidence.  To the extent the Applegate notes could have helped establish retaliatory motive, the jury never reached that issue because it found no adverse employment action.  Hearn not only fails to establish he is entitled to judgment as a matter of law on his retaliation claim, he also does not show the excluded evidence would have changed the outcome.  We therefore conclude that any arguable error was harmless.

### DISPOSITION

The judgment is reversed in part and affirmed in part.  The parties shall bear their own costs on appeal.

_____

PETROU, J.

I CONCUR:

_____

RODRÍGUEZ, J.

*PG&E v. Hearn*/A167742, A167991

32

**TUCHER, P.J., Dissenting in Part:**

The jury awarded respondent Hearn more than $2 million in damages, finding his employer defamed him by maliciously publishing false statements about him that tended to injure him in his occupation. Appellant Pacific Gas & Electric Company (PG&E) contends the trial court should have granted a defense judgment notwithstanding the verdict (JNOV) because the damages Hearn proved were not "defamation-specific." PG&E seeks to impose on Hearn an additional element he must prove regarding his damages, an element that is foreign to the well-established cause of action for defamation and creates a special exemption from tort liability for employers who defame employees in the course of terminating their employment. The proposition "that courts should not, for public policy reasons, enforce any tort liability arising in connection with the wrongful termination of an employment contract" is a "radical proposition" our Supreme Court long ago rejected. (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 649 (*Lazar*) (conc. opn. of Mosk, J.); see also *id*. at p. 644.) I would reject the proposition again here, along with the more tailored variant that the majority adopts today.

**I.**

"Defamation constitutes an injury to reputation . . . by means of libel," if in writing, or by slander. (*Shively v. Bozanich* (2003) 31 Cal.4th 1230, 1242.) Libel, in turn, has long been defined to include a "false and unprivileged publication . . . which exposes any person to hatred, contempt, ridicule, or obloquy, . . . or which has a tendency to injure him in his occupation." (Civ. Code, § 45.) A publication may be privileged if it is shared among individuals with a common interest in investigating an employee's misconduct, but only if its defamatory statements are made "without malice." (Civ. Code, § 47, subd. (c); *McGrory v. Applied Signal Technology, Inc.* (2013)

1

212 Cal.App.4th 1510, 1538 [common interest privilege applies to "statements by management and coworkers to other coworkers explaining why an employer disciplined an employee"].)

The jury found that PG&E defamed Hearn in only one of the four communications he challenged. The Corporate Security Department (CSD) investigative report was not actionable because its statements were substantially true. Likewise, the email from employee Kathy Ledbetter to management, summarizing the findings said to justify terminating Hearn's employment, and PG&E's January 18, 2019 letter informing Hearn of his termination. However, the jury found Hearn proved his defamation claim as to the December 12, 2018 report by Anthony Mar. Specifically, the jury found Mar made one or more of the following statements to a person other than Hearn: "a. That Mr. Hearn had violated PG&E's Employee Code of Conduct; [¶] b. That Mr. Hearn had misused company time; [¶] c. That Mr. Hearn had misstated his work activities; and/or [¶] d. That Mr. Hearn falsified his timecards." The jury further found: Mar's statement(s) tended to injure Hearn in his occupation; the statement(s) were not substantially true; Mar did not exercise reasonable care to determine their truth or falsity; and he acted with malice in that he either harbored hatred or ill will toward Hearn or had no reasonable grounds for believing the truth of the statement(s).

The jury then awarded Hearn $2,160,417 in damages, representing his past and future economic and noneconomic losses as a result of PG&E's defamation. The jury had been instructed that if Hearn proved this tort claim, he was entitled to compensation for each item of harm caused by PG&E's wrongful conduct, and had been further instructed on how to calculate lost earnings if Hearn proved these were a component of such

2

harm.[1]  Hearn had also sought similar damages under a different legal theory—that PG&E had discharged him in retaliation for disclosing the company's safety violations, in violation of Labor Code section 1102.5—but the jury found no liability on this theory, concluding instead that Hearn's damages flowed from PG&E's defamation.

PG&E does not dispute that substantial evidence supports each of the jury's findings.  It does not contend that Hearn's evidence fails to establish any of the recognized elements of a defamation claim: " '(1) a publication that is (2) false, (3) defamatory, (4) unprivileged, and (5) has a natural tendency to injure or causes special damage.' " (*Sanders v. Walsh* (2013) 219 Cal.App.4th 855, 862; see also *Hawran v. Hixson* (2012) 209 Cal.App.4th 256, 277.)  Nor does it contend that Hearn failed to prove the economic and noneconomic damages the jury assessed as resulting from Mar's defamatory report.

Instead, PG&E contends its JNOV motion should have been granted because Hearn failed to introduce evidence that his injury was independent of his termination.  This alleged shortfall is said to bring Hearn's case within the reach of what PG&E calls, without irony, "the *Foley* doctrine." (Citing *Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654 (*Foley*).)  Reading *Foley* and its progeny expansively, PG&E argues the contractual nature of the

---

[1] In light of the parties' respective litigation strategies, the jury was not asked to parse damages into more discrete categories of harm.  PG&E not only agreed to that approach, but extracted Hearn's consent to omit standard language from the pattern jury instruction that would have informed the jury reputational harm is presumed and damages are assumed, once the elements of defamation per se are proven. (See Judicial Council of California Civil Jury Instruction (CACI) No. 1704.)  Omitting this language from the instruction did not, of course, change the law, which entitles a plaintiff who proves defamation per se to receive compensation for assumed reputational harm. (See at pp. 11–12, *post*.)

employment relationship limits an employer's liability in tort for any harm that results from the discharge of an employee.

PG&E's broad theory of nonliability for admittedly tortious conduct finds no traction in the law. Further, I am perplexed and unpersuaded by the majority's attempt to craft a more narrow exemption for PG&E based on the facts of this case.

## II.

PG&E's theory fails because it is inconsistent with the California Supreme Court's admonition, "there is no '*Foley* doctrine' stating or implying that employers who terminate employees do or should enjoy broad special immunities from tort liability." (*Lazar*, *supra*, 12 Cal.4th at p. 648.) This is exactly the immunity PG&E seeks: it claims exemption from liability for damages otherwise recoverable in a defamation action solely because it committed this tort against an employee whom it had a contractual right to fire. PG&E purports to find support for its theory in three California Supreme Court cases—in chronological order, *Foley*, *Hunter v. Up-Right, Inc.* (1993) 6 Cal.4th 1174 (*Hunter*), and *Lazar*—but none of these cases supports PG&E, and the culminating case of this trio expressly refutes PG&E's theory.

In *Foley*, the California Supreme Court held that "the covenant of good faith and fair dealing applies to employment contracts and that breach of the covenant may give rise to contract but not tort damages." (*Foley*, *supra*, 47 Cal.3d at p. 663.) The Court reasoned that "the employment relationship is fundamentally contractual," and that "in the absence of legislative direction to the contrary contractual remedies should remain the sole available relief *for breaches of the implied covenant of good faith and fair dealing* in the employment context." (*Id.* at p. 696, italics added.) *Foley* addresses the remedies available for a plaintiff who proves a breach of a particular cause of

4

action grounded in the employment contract, but Hearn has never alleged a breach of the implied covenant of good faith and fair dealing, nor does he seek to. Instead, Hearn seeks compensation for defamation, a cause of action that in no way depends on the parties being in a contractual relationship. PG&E overlooks at its peril the italicized portion of the Supreme Court's statement, which limits the holding in *Foley* to a cause of action irrelevant to this case.

In *Hunter*, a closely divided Court extended the reasoning of *Foley* to a cause of action for fraud and deceit, but not in a manner that supports PG&E. The *Hunter* plaintiff sued his former employer, alleging a supervisor made misrepresentations to cause him to resign. (*Hunter*, *supra*, 6 Cal.4th at pp. 1178–1179.) The jury found the employer was contractually obligated not to discharge Hunter without good cause and that it lacked any such good cause, so that its conduct amounted to a wrongful constructive discharge. (*Id*. at pp. 1180, 1184.) Analyzing the circumstances , our Supreme Court concluded "wrongful termination of employment ordinarily does not give rise to a cause of action for fraud or deceit, even if some misrepresentation is made in the course of the employee's dismissal." (*Id*. at p. 1178.) The Court reasoned that the employer "simply employed a falsehood to do what it otherwise could have accomplished directly," namely to terminate the plaintiff's employment. (*Id*. at p. 1184.) Thus, the plaintiff had not "relied to his detriment on the misrepresentation in suffering constructive dismissal," and the fraud claim was accordingly "without substance." (*Ibid*.) But even as the *Hunter* court concluded the plaintiff could not pursue an "independent fraud claim aris[ing] from a misrepresentation aimed at termination of employment," it expressly left open the possibility that "a misrepresentation *not* aimed at effecting termination of employment . . . might form a basis for a

5

valid fraud claim even in the context of a wrongful termination." (*Id*. at p. 1185.)

Hunter is inapposite, for reasons that go beyond the fact that it analyzes a cause of action for fraud (*Hunter*, *supra*, 6 Cal.4th at pp. 1183–1184), while the present case involves defamation. The *Hunter* plaintiff failed to allege a valid fraud claim because he based that claim on a misrepresentation made to effectuate termination of his employment. By contrast, Hearn's theory of liability, accepted by the jury, was that Mar's report was defamatory and published with malice, and that PG&E subsequently terminated his employment as a consequence of this defamation; the theory was not that PG&E terminated Hearn's employment by means of defaming him. More fundamentally, the fraud claim in *Hunter* failed because Hunter could not prove the element of detrimental reliance (*id*. at p. 1184), whereas here there is no element of defamation that Hearn has failed to prove.

This difference is dispositive, as the California Supreme Court made clear in *Lazar*, *supra*, 12 Cal.4th 631, a case that discusses *Hunter* at length, walks back some of *Hunter*'s "broad language" (*Lazar*, at p. 646), and reinforces the conclusion that PG&E is not immune from defamation liability. The issue in *Lazar* was whether the plaintiff could state a valid cause of action for fraudulent inducement to enter an employment contract. (*Id*. at p. 638.) Lazar alleged he had relocated to Los Angeles to accept a job the employer falsely characterized as lucrative and secure, and he brought tort and contract claims after the employer terminated him. (*Id*. at pp. 635-637.) Allowing Lazar's claim for fraudulent inducement to proceed, the *Lazar* Court took the opportunity to "clarify" its prior decisions in *Hunter* and *Foley*. (*Lazar*, at p. 634.)

"Looking deep[ly]" at the rationale for its decision in *Hunter*, the Court emphasized that there it had "identified a situation in which a terminated employee was unable to plead all of the elements of fraud." (*Lazar, supra,* 12 Cal.4th at p. 641.) Specifically, "Hunter could not allege detrimental reliance." (*Id*. at p. 642.) But in deciding *Hunter,* the Court "did not thereby intend to call into question generally the viability of traditional fraud remedies whenever they are sought by a terminated employee." (*Lazar,* at p. 641.) Nor had the Court intended to suggest that "the law of fraud . . . necessarily applies differently in the employment context than in other contexts." (*Ibid*.) *Lazar* concludes its discussion on this point in language that could just as easily apply to this case: "*Hunter*'s core rationale (that a substantial fraud claim could not be pled because the element of detrimental reliance was absent) does not apply to this case." (*Id*. at p. 643.)

The *Lazar* Court likewise explained the issue in *Foley* in a manner that forecloses PG&E's argument. In *Foley*, the issue had been "whether to acknowledge the existence of a *previously unrecognized* cause of action" for tortious breach of an implied contract covenant. (*Lazar*, *supra,* 12 Cal.4th at p. 644.) By contrast, the issue in *Lazar* was whether the Court "should restrict the availability of traditional tort remedies when they are sought in the employment context." (*Ibid*.) The *Foley* Court had declined judicially to *expand* tort law because it concluded such an extension could have a profound effect on the nature of employment and was thus " 'better suited for legislative decisionmaking.' " (*Lazar*, at p. 644.) The *Lazar* Court explained it would exercise that same judicial restraint in declining to *disallow* a traditional fraud claim. (*Ibid*.) In language that could apply equally to Hearn's case, the *Lazar* Court cautions, we must "be mindful that our Legislature more than a century ago codified the common law cause of action"

7

for the relevant torts, and "[t]hese statutes provide no express exception for employers or employees." (*Ibid*.)

Because the well-established and long-codified cause of action for defamation by libel admits to no exception for employers (see Civ. Code, § 45), PG&E's claimed exemption from defamation liability should likewise be rejected. The Legislature has established the measure of damages for defamation as "the amount which will compensate for all the detriment proximately caused thereby," again with no carve-out for losses attributable to termination of employment. (Civ. Code, § 3333; see also *Wong v. Jing* (2010) 189 Cal.App.4th 1354, 1379.) This case, like *Lazar*, is a case in which the defendant seeks to "*constrict* traditional tort remedies" that are now prescribed by statute. (*Lazar, supra,* 12 Cal.4th at p. 647.) *Foley* was a case in which the court declined to expand a cause of action for breach of an implied contract term to include a new tort remedy. (*Lazar*, at p. 647.) "*Foley* does not provide authority for exempting employers from ordinary fraud rules that apply to Californians generally," the *Lazar* Court emphasized. (*Lazar,* at p. 645.) "In fact, *Foley*'s entire thrust is to the contrary insofar as [*Foley*] held employers to ordinary, rather than special, standards." (*Ibid*., citing *Foley, supra*, 47 Cal.3d at p. 693.) Following *Lazar*, I would hold PG&E to ordinary defamation rules, declining to adopt a special exemption for employers or otherwise erode traditional tort remedies.[2]

---

[2] In clarifying there is no *Foley* doctrine immunizing employers from tort liability, the *Lazar* Court also limited the scope of two Court of Appeal decisions upon which PG&E heavily relies, *Hine v. Dittrich* (1991) 228 Cal.App.3d 59, and *Soules v. Cadam, Inc.* (1991) 2 Cal.App.4th 390. (*Lazar, supra*, 12 Cal.4th at pp. 647-648.) The *Lazar* Court declined to adopt the "sometimes sweeping analyses or conclusions" in those cases (*id*. at p. 648), as do I.

8

## III.

The majority traces the immunity it recognizes for PG&E to different language in *Lazar* and *Hunter*.  (See Maj. opn. *ante*, at pp. 18–19, citing *Lazar*, *supra*, 12 Cal.4th at p. 643; *Hunter*, *supra*, 6 Cal.4th at p. 1178.)  Principally, this is the cryptic comment in *Lazar* that *Hunter* meant "to preclude fraud recovery only where 'the result of [the employer]'s misrepresentation is indistinguishable from an ordinary constructive wrongful termination.' "  (*Lazar*, at p. 643.)  The majority also extracts from the same cases a second hurdle for employees to clear:  the damages they seek "cannot exclusively ' "result from [the] termination *itself*." ' "  (Maj. opn. *ante*, at p. 19.)

The facts of Hearn's case are a poor fit for the first of the majority's hurdles.  To begin with, I disagree with the majority's assertion that "Hearn's defamation claim was founded on the same conduct—i.e., the creation of the Mar report and its use in his termination—that would form the basis for a wrongful termination."  (Maj. opn. *ante*, at p. 25.)  The creation of the Mar report was *not* the basis for the wrongful termination claim that Hearn brought in this case.  He claimed PG&E had wrongfully discharged him in retaliation for his disclosure of suspected safety violations, a violation of Labor Code section 1102.5 completely unrelated to the defamatory statements in the Mar report.  The jury found Hearn's discharge was not wrongful in the sense alleged by Hearn, declining to find PG&E liable for a retaliatory wrongful discharge.  The majority preserves the jury's findings as to the employment claim under the governing substantial evidence rule, but fails to credit the jury's finding that PG&E is liable for defamation notwithstanding a record that establishes *all* elements of that tort.

9

For its part, PG&E makes no substantive effort to show that Hearn's defamation claim is " 'indistinguishable from an ordinary constructive wrongful termination.' " (*Lazar, supra,* 12 Cal.4th at p. 643.)  The *Hunter* jury found the employer in that case had breached an implied contract not to terminate Hunter's employment without good cause, and it was this contractual right that made Hunter's constructive termination wrongful. (*Hunter, supra,* 6 Cal.4th at pp. 1180, 1184.)  Hearn makes no similar contract-based claim.[3]  Instead, Hearn argues that his discharge was the consequence of an entirely different course of conduct that was itself tortious—the promulgation of the defamatory Mar report.  The jury so found.

Moreover, the jury found corporate communications more directly tied to PG&E's termination of Hearn's employment—Ledbetter's email to management seeking authorization to terminate Hearn's employment and the letter informing Hearn he was being terminated—were not defamatory.

---

[3] Similar to *Hunter*, the plaintiff in *Lazar* brought a claim for breach of contract alongside his tort claim for fraudulent inducement of employment contract, and it was to this contract claim that the Court said Lazar must look to recover "any loss of income allegedly caused by wrongful termination of his employment" with the defendant company. (*Lazar, supra,* 12 Cal.4th at pp. 637, 649.)  But I do not read this observation as limiting the damages available on Lazar's *tort* cause of action.  (Cf. Maj. opn. *ante*, at p. 19.) Immediately following this statement, the *Lazar* Court instructs that Lazar "may proceed with his claim for fraud in the inducement of employment contract, properly seeking damages for 'all the detriment proximately caused thereby,' " and "any overlap between damages recoverable in tort and damages recoverable in contract would be limited by the rule against double recovery." (*Lazar*, at p. 649.)  Had the Court believed that damages recoverable on the plaintiff's tort theory necessarily excluded losses that flowed from the termination of his employment with the defendant company (as PG&E contends), it would not have used such all-inclusive language to define the measure of tort damages, nor expressly anticipated the possibility of double recovery.

Taken together, the jury's defamation findings necessarily reject the allegation that Hearn's defamation case is indistinguishable from an ordinary claim for wrongful termination.

Displacing the jury's findings, the majority adopts a new factual theory: that PG&E had already decided to terminate Hearn when it placed him on suspension, and that Mar was hired to document Hearn's termination, thus making his defamatory conduct indistinguishable from a wrongful discharge. (Maj. opn., *ante*, at pp. 4–5, 20–23.) This version of the facts seems inconsistent with our standard of review, as the record does not compel a finding that Mar was documenting a preordained employment termination decision.[4] Nor am I persuaded by the majority's attempt to bolster its theory by pointing out that the jury, in answering questions on the special verdict form, found Mar's report was defamatory but other documents with similar statements were not. This perceived discrepancy was never raised by PG&E, whose JNOV and appeal are both expressly limited to a discrete issue of law, and it overlooks that Mar's report contained very specific factual accusations about Hearn that do not appear in any of the other documents the jury was asked to evaluate.

The second of the majority's hurdles is problematic for a different reason: because proof of actual damages is not required in a defamation case, it is difficult to understand why, with the tort of defamation in particular, courts should require a plaintiff to demonstrate that damages result from

---

[4] For example, Mar testified that his assignment as a consultant was to review whether, in the Napa Yard, "there was a trend of work being performed out in the field that may have taken longer" than tasks required; Hearn's name was not mentioned when PG&E gave him this assignment; and he reviewed Hearn's performance no differently from anyone else's in the "mountain of paper" he examined.

11

something other than termination of employment. When a statement is defamatory on its face, i.e., "without the necessity of explanatory matter" (Civ. Code, § 45a), it is considered libelous per se, and actionable without proof of special damages. (*Walker v. Kiousis* (2001) 93 Cal.App.4th 1432, 1441.) General damages may be awarded for the injury to the plaintiff's reputation, which is *presumed*. (*Weller v. American Broadcasting Companies, Inc.* (1991) 232 Cal.App.3d 991, 1014 [defamation plaintiff properly awarded presumed damages in addition to actual damages].) The defamed plaintiff may also recover special damages, which include "*all* damages that plaintiff alleges and proves that he or she has suffered in respect to his or her property, business, trade, profession, or occupation. . . ." (Civ. Code, § 48a, subd., (d)(2), italics added.) As to this category of damages, it has been suggested that the "most important items are loss of a job or business opportunities." (6 Witkin, Summary of Cal. Law (11th ed. 2024) Torts, § 1885; see, e.g., *O'Hara v. Storer Communications, Inc.* (1991) 231 Cal.App.3d 1101.) Yet, contrary to the language of the statute, damages associated with loss of a job are what the majority seeks to exclude for employer defendants. Finally, I note that damages for emotional distress are recoverable in a defamation action (*Douglas v. Janis* (1974) 43 Cal.App.3d 931, 940–941), and noneconomic damages formed more than a quarter of the award in this case. I see no reason why those damages should be excluded, when the jury found they were caused by PG&E's defamatory conduct.

Contrary to PG&E's assumption on appeal, the harm caused by defamation is a distinct harm, regardless of whether the tort is committed by an employer. Because defamation is an injury to reputation, a defendant who commits this tort *necessarily* causes reputational harm distinct from the harm experienced when an employment contract is breached. Thus, a

12

defamation claim is not barred by exclusivity provisions of the workers' compensation law; courts have held the employee's reputational harm is a distinct harm from a physical or mental injury. (See, e.g., *Davaris v. Cubaleski* (1993) 12 Cal.App.4th 1583, 1590–1592; see also *Operating Engineers Local 3 v. Johnson* (2003) 110 Cal.App.4th 180, 186–187.) The jury found that Hearn suffered just such an injury to his reputation, and it was as a consequence of that injury to his reputation that his employment was terminated. The fact that PG&E's defamatory conduct caused Hearn to incur damages equivalent to those that would have flowed from a retaliatory wrongful termination, had there been one,[5] should not insulate PG&E from tort liability for the defamation that actually occurred.

I respectfully dissent from that portion of the majority's opinion that reverses the judgment against PG&E.


TUCHER, P.J.

---

[5] The majority perceives a "discordance" in allowing an employee who fails to prove wrongful termination to recover "termination damages" only because it conflates an issue of harm with an issue of damages. (Maj. opn., *ante*, at p. 23.) The harm Hearn proved in support of his cause of action for defamation was that PG&E injured his reputation, causing him to lose his job. The retaliatory discharge claim Hearn failed to prove was premised on a different alleged harm: that PG&E fired him because he reported safety violations. That the same *damages* flowed from these two distinct harms is legally irrelevant.

13

## *PG&E v. Hearn* (A162742, A167991)

Trial Court:      Napa County Superior Court

Trial Judge:      Hon. Cynthia P. Smith

Attorneys:

Paul Hastings, Elena Rene Baca, Marisa Michelle Sherman, Sean David Unger, Eric David Distelburger for Defendant and Appellant.

Oliver & Schreiber, Monique Olivier; Costin Law and Anne Casey Costin for Plaintiff and Appellant.